**LIGGETT GROUP INC.,**
et al., Plaintiffs,

v.

**AFFILIATED FM INSURANCE
COMPANY, et al.,**
Defendants.

**C.A. No. 00C–01–207 HDR.**

Superior Court of Delaware,
New Castle County.

Submitted: Dec. 22, 2000.
Decided: May 15, 2001.

Michael D. Goldman, John E. James, Richard L. Horwitz and William R. Denny of Potter Anderson & Corroon LLP, Wilmington, and Robert L. Carter, Jr., Andrew M. Reidy, Daniel G. Jarcho, and John M. Clerici of McKenna & Cuneo, L.L.P., Washington, D.C., for Plaintiffs Liggett Group Inc. and Brooke Group Holding Inc.

Donald E. Reid of Morris, Nichols, Arsht & Tunnell, Wilmington, as Liaison Counsel for Defendants.

## CHOICE OF LAW OPINION

RIDGELY, President Judge.

Plaintiffs Liggett Group, Inc. ("Liggett") and Brooke Group Holding, Inc. ("Brooke") have filed this civil action against Affiliated FM Insurance Company and thirty-two other insurance companies [1]

---

1. The defendants are: Affiliated FM Insurance Company, Ace Property and Casualty Insurance Company, A.I.U. Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Commercial Union Insurance Company, Continental Casualty Compa-

to determine Plaintiffs' rights and Defendants' obligations under more than one-hundred liability insurance policies sold to the plaintiffs (and/or their parent companies) by the thirty-three defendants from 1970 until 1998. Plaintiffs seek both defense and indemnification coverage for underlying claims that have arisen in connection with more than one-thousand tobacco health-related lawsuits filed against Plaintiffs throughout the United States.

From 1970 to 1974, Liggett was a Delaware corporation operating numerous businesses throughout the country with its headquarters in New York. Liggett then moved its headquarters to Durham, North Carolina in 1974, where it remained until 1979 when the headquarters was moved to Montvale, New Jersey. In 1983, Liggett was acquired by GrandMet USA, Inc. ("Liggett/GrandMet"), another corporate conglomerate headquartered in New York, and in 1986, Liggett/GrandMet sold the Liggett tobacco business to a company controlled by Bennett S. LeBow, which later became Brooke Group Holding Inc. Brooke, a Delaware corporation, maintained its principal place of business in New York until 1992. From 1992 to the present, Brooke's headquarters have been located in Miami, Florida. Liggett's headquarters have been located in Durham, North Carolina since the 1986 sale of its tobacco business. Although Liggett's headquarters has moved as noted, all of its tobacco manufacturing has been based in Durham, North Carolina throughout the policy periods.

Defendants are thirty-three insurance companies that sold Plaintiffs (or their parent companies) liability insurance for twenty-eight years, from 1970 until 1998. Defendants' principal places of business are located in at least nine different states.[2] They deny coverage in this case on various grounds including late notice, expected or intended harm, known loss, and the terms of specific exclusions within the policies.

## I. THE ISSUE

■ The present issue before the Court is the choice of the governing substantive law to be applied in this case. Plaintiffs assert that universal principles of insurance law should apply to the duty to defend issues, and further advocate that the

---

ny, Continental Insurance Company, Federal Insurance Company, First State Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Insurance Company of the Midwest, Home Indemnity Company, The Home Insurance Company, International Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New England Insurance, Northbrook Excess and Surplus Insurance Company, Old Republic Insurance Company, Pacific Insurance Company, Ltd., Reliance Insurance Company of Illinois, Royal Indemnity Company, Royal Insurance Company of America, Seaboard Surety Insurance Company, St. Paul Mercury Insurance Company, Transcontinental Insurance Company, Transportation Insurance Company, Travelers Casualty and Surety Company, Twin City Fire Insurance Company, Vigilant Insurance Com-

pany, Westport Insurance Company, and Zurich Insurance Company.

2. Defendants' principal places of business include California (for Defendant Harbor), Connecticut (for Defendants Hartford Accident, Hartford Casualty, Hartford Midwest, Pacific, Twin Cities and Westport), Hawaii (for Defendant Pacific), Illinois (for Defendants Northbrook, Royal Insurance Company of America, Transcontinental and Transportation), Massachusetts (for Defendants Commercial Union, First State, Lexington and New England), New Jersey (for Defendants Federal and Vigilant), New York (for Defendants AIU, Birmingham Fire, Home, National Union and Seaboard), North Carolina (for Defendant Royal Indemnity), Pennsylvania (for Defendant Old Republic), and Rhode Island (for Defendant Affiliated FM).

determination regarding choice of law for the duty to indemnify is not yet ripe for adjudication. Alternatively, Plaintiffs argue that North Carolina law should apply because Plaintiffs' operations in North Carolina are the common thread among insureds, insurers and policies during the majority of the relevant time period. Defendants answer that a decision on choice of law should be made now and that New York contacts predominate over any other state's contacts for the majority of the time and transactions between the parties. For the reasons which follow, the Court concludes that this issue is ripe for adjudication and that the substantive law of North Carolina will be applied in this case.

## II. DISCUSSION

### A. The Need for a Global Choice of Law

■ Delaware has adopted the Restatement's "most significant relationship test" for determining which state's law to apply.[3] Choice of law questions involving insurance coverage disputes are resolved by an analysis of the contacts set forth in Restatement (Second) Conflict of Laws Section 188 and Section 193.[4] These contacts must also be evaluated in light of the related principles of Section 6.[5]

■ At the outset, the Court recognizes that the Restatement (Second) contemplates first an issue-by-issue approach to determining choice of law.[6] However, in complex cases, such as this, involving large numbers of insurers and policies with contacts in various states, the Court cannot ignore the practical consequence of "monumental, very expensive, time-consuming discovery and legal research"[7] facing the litigants. Indeed, the parties agree that in the interests of economy, ease of application, and uniformity of result, the Court should require the application of one state's law, but only disagree as to whether North Carolina or New York law should apply. Choice of law is a threshold issue in complex litigation. The Case Management Order contemplates a decision on choice of law at this stage after discovery and briefing on that issue. Because that discovery and briefing is complete, the choice of law is ripe for determination now.

### B. The Significance of Nationwide Product Liability Risks

■ Section 193, titled "Contracts of Fire, Surety or Casualty Insurance," specifically addresses choice of law in insurance coverage disputes. Restatement (Second) Section 193 states that the Court should apply the "local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy" unless another state has a more significant relationship under the principles stated in Section 6. The potentially "insured risks" in this case are the tobacco-related injuries in the underlying claims, which span 49 states and

---

3. *Hoechst Celanese Corp. v. National Union Fire Ins. Co.*, Del.Super., C.A. 89C–SE–35, 1994 WL 721651, Gebelein, J. (Mar. 28, 1994), Mem. Op. at 10.

4. *Id.* at 10, 11.

5. *Id.*

6. *See, e.g.*, Restatement (Second) Conflict of Laws § 188 (1971) (stating that "[t]he rights and duties of the parties with respect to *an*

*issue* in contract are determined by the local law of the state which, with respect to *that issue*, has the most significant relationship to the transaction and the parties") (emphasis added).

7. *Sequa Corp. v. Aetna Cas. & Sur. Co.*, Del.Super., C.A. No. 89C–AP–1, 1995 WL 465192, Herlihy, J. (July 13, 1995), Mem. Op. at 14.

the District of Columbia. Because nationwide product liability claims are involved, there is no principal location of these risks in this case. Restatement (Second) Section 193 comment (b) recognizes that this section assumes less significance "where the policy covers a group of risks that are scattered throughout two or more states." That is exactly the situation here. Consequently, this Court will follow the principles enumerated in Section 188 in the light of the related principles of Section 6 to determine which state's law to apply.

## C. Section 188 Conflict of Laws Principles

Section 188 provides, in pertinent part, that:

In the absence of an effective choice of law by the parties, the contacts to be taken into account ... include (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

■ The Court may not simply tally the contacts between jurisdictions but must evaluate the contacts according to their relative importance with respect to the particular issue and the principles listed in Section 6.[8]

## 1. The Domicile, Residence, Nationality, Place of Incorporation and Place of Business of the Parties

■ This Court has held that the most significant factor for conflict of laws analysis in a complex insurance case with multiple insurers and multiple risks is the principal place of business of the insured because it is "the situs which link[s] all the parties together."[9] This Court has reasoned that "[k]nowing the potential for claims in any number of states, common sense would dictate that the parties would consider the insured's principle [sic] headquarters as the one jurisdiction that ties all potential parties together."[10] Indeed, where, as here, the insurer defendants are located among many different states, the insured's principal place of business naturally assumes a greater significance in the Court's conflict of laws analysis.

The insurance coverage in issue here spans twenty-eight years. Liggett's corporate offices have been located in North Carolina for approximately nineteen of the twenty-eight years. Liggett's corporate offices were in New York from 1970 to 1974 and in New Jersey from 1979 until 1986, but apart from these two short time

---

8. There are seven principles to be considered under Restatement (Second) of Conflict of Laws § 6 (1971):
   (a) the needs of the interstate and international systems,
   (b) the relevant policies of the forum,
   (c) the relevant policies of other interested states and the relative interests of those states in determination of the particular issue,
   (d) the protection of justified expectations,
   (e) the basic policies underlying the particular field of law,
   (f) certainty, predictability, and uniformity of result, and

   (g) ease in the determination and application of the law to be applied.

9. *Monsanto Co. v. Aetna Cas. & Sur. Co.*, Del.Super., C.A. No. 88C–JA–118, Poppiti, J. (Oct. 29, 1991), Order at 9; *See also Hoechst Celanese* at 15.

10. *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, Del.Super., C.A. No. 89C–AU–99, 1991 WL 236943, Poppiti, J. (Oct. 22, 1991), Order at 19 (citing *CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co.*, D. R.I., 739 F.Supp. 710, 715 (1990)).

periods, Liggett's corporate offices have been located in Durham, North Carolina.[11]

Defendants contend that North Carolina is not a significant contact because Liggett had its principal place of business in two other states during the policy periods at issue and Liggett's corporate parents were also located in other states when they secured their insurance policies. However, the Defendants' argument focuses on only eleven of the twenty-eight years of policies at issue and only a handful of the more than one-hundred policies that cover Liggett as a subsidiary. This Court has concluded that where an insured's place of business has been located in a single state for nearly the entire duration of the relevant policy periods, that state is the principal place of business for choice of law analysis.[12] Although some policies have only limited or no contacts with North Carolina, the unifying contact among the parties and policies with Liggett's headquarters in North Carolina weighs heavily in the Court's analysis.

Defendants further argue that applying North Carolina law would give dispositive effect in choosing the governing law to Liggett's post-policy move of its headquarters to North Carolina. They contend this thwarts the reasonable expectations of the parties that issued policies while Liggett was in New York and New Jersey. Again, Defendants focus on eleven years while the Court must balance contacts spanning the entire twenty-eight year period at issue. This Court is not faced with a situation where an insured moved its principal place of business after spending the majority of its time in another state and now seeks to have its new location provide the governing law for all of its policies. Rather, Liggett's current principal place of business has been located in North Carolina for the majority of the policy periods. Liggett's tobacco manufacturing operations and marketing functions that are alleged to have created the insured risks have been located exclusively in North Carolina from the beginning of the period at issue until at least 1997. I find that North Carolina is the situs which links all of the parties together.

## 2. The Place of Contracting

■ Under Section 188(2)(a), the Court must consider the importance of the place of contracting with regard to the insurance coverage dispute. The place of contracting is the place where the last act occurred that was necessary to give the contract binding effect.[13] While Delaware courts have not defined the final act necessary to form a binding insurance contract here, other courts have defined it as "the approval of an insurance application, the signing and deposit of the insurance policy in the mail, the receipt of the premium by the insurer, and the countersignature by

11. Defendants have referred the Court to a Liggett affidavit filed in a New Jersey case describing "three co-equal company headquarters in New Jersey, Texas and North Carolina" for its "sales and marketing operations, the backbone of its discount cigarette business" since 1997. Given the choices here between North Carolina and New York, Liggett's "co-equal headquarters" in Texas and New Jersey for these operations during one year of the policy periods does not diminish the overall significance of the North Carolina contacts.

12. *Hoechst* at 15 (stating that "New Jersey has only been HCC's principal place of business since February of 1987, during only two years of the policy periods relevant to this litigation. In contrast, New York is the state in which HCC was headquartered and had its principal place of business from 1978 through 1987, nearly the entire duration of the relevant policy periods").

13. Restatement (Second) of Conflict of Laws § 188 cmt. e (1971).

the insurer's agent." [14]

Defendants argue that New York is the place of contracting because delivery of the policies took place in New York when the policies were delivered to Liggett/Grand-Met's New York brokers, namely Frank B. Hall and the JLS Group. Furthermore, Defendants point out that the policies issued to Liggett/GrandMet, Intercontinental Hotels, and the LeBow entities were prepared and signed by underwriters based in New York.

This Court has recognized that the place of contracting is a relatively insignificant contact and "will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract." [15] This case involves more than one-hundred contracts between Liggett and its corporate parents and their insurers. It is difficult to determine the last act that made each contract binding and where that act occurred. Defendants have identified at least eight different states where at least some contract negotiations took place. Given the circumstances of this case, I am not persuaded that New York's contact is of greater significance simply because the policies were delivered to Liggett's New York brokers. Any approval of the insurance contracts by Liggett would have had to have been authorized in North Carolina, [16] where Liggett's Insurance and Risk Management Department has resided for the majority of the twenty-eight year period at issue. Because negotiations have occurred in a variety of states and the final acts necessary to form each binding contract are not readily ascertainable, the place of contracting is not a significant contact.

### 3. The Place of Negotiation of the Contract

Under Restatement (Second) Section 188(2)(b), the Court must determine and weigh the significance of the place of negotiation of the contract. Restatement (Second) Comment (e) states that "where the parties negotiate and agree on the terms of their contract is a significant contact [as] such a state has an obvious interest in the conduct of the negotiations and in the agreement reached." [17]

Defendants argue that this factor favors New York law because Liggett used New York brokers during the early 1970s and from 1981 to 1988. From 1981 to 1986, Liggett's insurance broker, Frank B. Hall, conducted negotiations with insurers on behalf of Liggett in New York. From 1986 to 1988, Liggett used brokers from JLS Group, who like Frank B. Hall, negotiated policy terms and conditions on behalf of Liggett in New York. Similarly, the policies issued to Intercontinental Hotels and the LeBow entities were negotiated in New York by Frank B. Hall.

Liggett's use of New York brokers, however, is of little significance and is outweighed by the location of Liggett's Insurance and Risk Management Department for several reasons. First, whatever

---

14. *North American Philips Corp. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 88C–JA–155, 1994 WL 555399, Bifferato, J. (Sept. 2, 1994), Mem. Op. at 4 (citing *Appleman, Insurance Law and Practice* § 7080 (1981)).

15. *E.I. du Pont* at 14 (citing Restatement (Second) of Conflict of Laws § 188 cmt. e (1971)).

16. *See, e.g., E.I. du Pont* at 9 (stating that "[d]espite the fact that du Pont may have utilized the services of various brokers, these brokers had no authority to enter into binding contracts without prior express or specific approval from du Pont. In contrast, the responsibilities of the defendant insurers were divided among numerous states").

17. Restatement (Second) of Conflict of Laws § 188 cmt. e (1971).

weight should be accorded to the location of Liggett's New York brokers is counterbalanced by the fact that Liggett also had brokers in North Carolina from 1975 to 1981 and from 1988 to 1998—sixteen of the twenty-eight years at issue. Additionally, this Court has held that the use of brokers as intermediaries "significantly diminishes the importance of the location of the brokers."[18] Indeed, it appears that the function of Frank B. Hall and JLS Group was limited to working out details with insurers based on specifications given by Liggett's Insurance and Risk Management Department. It was Liggett's Insurance and Risk Management Department that planned the substance of the policies and that Department has been located in North Carolina for twenty-three of the twenty-eight years in issue. Prior decisions of this Court have recognized that the roles of brokers, which lack "authority to enter into binding contracts without prior express or specific approval from [the insured]," "pale in comparison and significance to ... [the role of the insured], who would necessarily have been actively involved in the negotiation and planning of all contracts to which it was a party."[19]

Overall, the place of negotiation plays a relatively less significant role in the Court's analysis in this case. In *E.I. du Pont v. Admiral Ins. Co.*, this Court recognized that "the place of negotiation is not as important when no one single place of negotiation and agreement exists."[20] Indeed, depending on which insurer Liggett was negotiating with, negotiations took place in a variety of states, including North Carolina, New York, Massachusetts, New Jersey, Connecticut, Georgia, California, and Illinois. Nonetheless, to the extent the place of negotiation is a significant contact where negotiations take place in several states, the largely singular place of the insured's Insurance and Risk Management Department is the more significant contact.

### 4. The Place of Performance

The place of performance is also a contact to be considered under the Restatement as "[t]he state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform."[21] The place of performance has been defined as the state from which the insured makes its premium payments and the state from which the insurer mailed premium invoices or paid claims.[22]

Defendants argue that the contacts with regard to the place of performance favor New York law. Defendants note that in the early 1970s one of Liggett's insurers, the Home Insurance Company, sent its premium invoice to Liggett's New York office, and during the period from September 1981 to October 1988, the insurers sent their bills to the New York brokers, who then paid the premiums on behalf of Liggett. Liggett also gave notice of claims through its New York brokers during this time period, and while Liggett's headquarters were in New Jersey, Liggett did not mail the payments directly to the insurers, but instead sent them to brokers in New York.

**18.** *Monsanto* at 7 (citing *CPC International v. Northbrook Excess & Surplus Ins. Co.*, D. R.I., 739 F.Supp. 710, 712 (1990)).

**19.** *E.I. du Pont* at 9.

**20.** *E.I. du Pont* at 15; *See also North American Philips Corp. v. Aetna Cas. & Sur. Co.*, Del.Super., C.A. No. 88C–JA–155, 1994 WL 555399, Bifferato, J. (Sept. 2, 1994), Mem. Op. at 5.

**21.** *Id.*

**22.** *North American Philips* at 2.

Defendants have focused on only a portion of the policies and the time period at issue. Even so, Liggett's use of New York brokers is not the decisive factor in determining the place of performance. The New York brokers acted only as intermediaries in the payment process; they received payment from Liggett and then passed it on to the insurers. The brokers are not parties to the contracts or this action. They served as a conduit in the payment process.

Even if the location of Liggett's brokers is the place of performance, their location would still favor North Carolina law in this case. Liggett's insurance brokers were located in North Carolina for eighteen of the twenty-eight years at issue, as compared with the seven-year period the brokers were in New York. Furthermore, Liggett's Accounts Payable Department made premium payments almost exclusively from North Carolina. Defendants, in contrast, were located and performed their duties in several states. Thus, under this analysis, the place of performance favors North Carolina.[23]

### 5. The Location of the Subject Matter of the Contract

Lastly, the subject matter of the contract is a factor to be considered as "[t]he state where the thing or risk is located will have a natural interest in the transactions affecting it."[24] This Court has held in environmental insurance coverage cases that the location of the subject matter is the location of the sites where the environmental damage or injury occurred.[25] In

this case, there is no particular location of the subject matter because the lawsuits filed in 49 states and the District of Columbia allege injury to individuals that occurred throughout the country. I conclude that this factor sheds no meaningful light on the choice of law to be made in this case.

### D. Section 6 Choice of Law Principles

The application of North Carolina law in this case is consistent with the conflict of laws principles in Restatement (Second) Section 6. While the Section 6 principles underlie all of the principles discussed above and "vary somewhat in importance from field to field and from issue to issue,"[26] the Court finds the principles in Sections 6(c) and 6(d) worth discussing separately.

### 1. The Relative Interests and Policies of the Competing States

Under Restatement Section 6(c), the Court must consider "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue." Comment (f) states that "it is fitting that the state whose interests are most deeply affected should have its local law applied." North Carolina is an interested state because it is the chief location of Liggett's tobacco operations and Liggett's principal place of business. Thus, North Carolina has a legitimate interest in governing the rights of its domestic businesses to insurance coverage. New York is also an interested state as it is where the parties entered into a number

---

**23.** *See North American Philips* at 6 (stating that "[s]ince NAPC was located in New York and was performing there and Defendants were located in several states and were performing there, [it][sic] is apparent that the majority of performance occurred in New York").

**24.** Restatement (Second) of Conflict of Laws § 188 cmt. e (1971).

**25.** *North American Philips* at 3.

**26.** *Sequa Corp. v. Aetna Cas. & Sur. Co.*, Del.Super., C.A. 89C–AP–1, Herlihy, J. (May 21, 1992), Mem. Op. at 8.

of contractual relationships and the home of at least five of the insurer defendants. Accordingly, New York has an interest in applying its law to govern the conduct of parties within its borders and the obligations of its insurers to defend or indemnify claims.

Ultimately, however, the Court finds that the relative interests of New York and North Carolina are not in conflict as both states share the same general policy interests in promoting insurance coverage and resolving ambiguities in favor of policyholders. Thus, even though interpretation of policy language may differ among states, this Court finds that any potential conflict is inconsequential because the states share the same general policy regarding insurance coverage disputes.[27]

### 2. The Protection of Justified Expectations

It is important to contracting parties that the uncertainty associated with entering into commercial transactions be reduced by applying the state's law that the parties anticipated would apply.[28] Notwithstanding this principle, parties to insurance contracts often do not include a choice of law provision. Most "Comprehensive General Liability" insurance policies contain similar, standard-form insurance policy language. In theory, at least, a standard-form insurance contract should be interpreted the same in every jurisdiction.[29] More likely, however, the insurers simply chose not to insert a choice of law provision in their contracts. As this Court stated in *National Union v. Rhone–Poulenc:*

> One reason, perhaps, that they choose not to do so is that certainty with regard to the application of a jurisdiction's law does not mean that the law itself remains static. In this case, for instance, much in the law has changed in the 20 year interval since many of the policies at issue were entered (including Delaware's rejection of the *lex loci contractus*). The insurers may believe that given the volatility in the law their interests are better served by the lack of a choice of law provision, which allows them to argue the application of the law of that jurisdiction most favorable to them at the time of suit. Whatever the reason, however, it ill behooves sophisticated contracting parties like the insurers, who fail to enter a choice of law provision in a contract, to argue that they are suffering from uncertainty or that the choice of a particular jurisdiction's law does not comport with their expectations upon contracting.[30]

In any event, the location of Liggett's headquarters, tobacco operations, and marketing operations were known or should have been known to the parties at the time of contracting. Given the nationwide scope of the potential tobacco health-related claims, the parties should have expected that North Carolina would be an important location for choice of law analysis for these claims. Thus, in the absence of a choice of law provision, the application

---

**27.** *North American Philips* at 11 (concluding that the relative interests of states are not in conflict when they share the same policy in promoting insurance coverage and resolving ambiguities in favor of policyholders).

**28.** Restatement (Second) of Conflict of Laws § 6 cmt. f (1971).

**29.** *See, e.g., Keene Corp. v. Insurance Co. of N. Am.,* D.C.Cir., 667 F.2d 1034, 1041 n. 10 (1981) (holding that there was no choice of law question because the insurance policies were standard-form policies and general principles of insurance law are the same in virtually every state).

**30.** *National Union* at 12–13.

of North Carolina law serves to protect that justified expectation.

### E. The Reliance Policies' Service of Suit Provisions

■ Defendants argue that the "Service of Suit" provisions contained in Liggett's policies with Reliance Insurance Company of Illinois ("Reliance") mandate application of New York law. Liggett agreed to service of suit provisions in two of its policies (1994–1996) from Reliance. The provisions state the following:

*Service of Suit:* It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, and Insured, will submit to the jurisdiction of State of New York, and will comply with all the requirements necessary to give such Court jurisdiction. All matters arising hereunder shall be determined in accordance with the law and practice of State of New York.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured, or any beneficiary hereunder arising out of this Policy.

This Court has held that service of suit clauses do not constitute choice of law provisions because they have been interpreted to demand application of the forum's whole law.[31] The whole law of a state includes its choice of law rules, which when applied may direct the court to apply a different state's substantive law.[32] This Court has explained that "if the drafters of the clause had intended the local law of the forum chosen by the insured to apply ... they would have included the terms 'local law' or 'substantive law' in the service of suit clause."[33]

Consistent with the precedent of this Court,[34] I am satisfied that the service of suit provisions in the Reliance policies refer to the whole law of New York, not solely its substantive law. The phrase "the law and practice of [the] State of New York" is a broad declaration that by its plain language encompasses the whole law of New York, including choice of law rules. Accordingly, the Court will consider the choice of law rules of New York for guidance on which state's law should apply to the Reliance policies.

New York uses a "center of gravity" or "grouping of contacts" approach to analyze choice of law questions in contract cases.[35] The purpose of this approach is "to establish which state has the most significant relationship to the transaction and the parties."[36] Thus, New York has effectively adopted the Restatement's "most signifi-

---

**31.** *Hoechst* at 4.

**32.** *Id.* at 4.

**33.** *Id.* at 4.

**34.** *See Hoechst* at 4; *North American Philips* at 1; *Monsanto Co. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 88C–JA–118, Poppiti, J. (Jan. 19, 1990), Order at 9; *Sequa Corp. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No.

89C–AP–1, 1992 WL 147994, Herlihy, J. (May 21, 1992); *Chesapeake Utilities Corp. v. American Home Assurance Co.,* D. Del., 704 F.Supp. 551 (1989).

**35.** *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* N.Y. Ct.App., 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065, 1068 (1994).

**36.** *Id.*

cant relationship test" for determining which state's law to apply. Indeed, New York courts cite to the Restatement (Second) of Conflict of Laws and analyze the same contacts as suggested by Restatement Sections 188 and 6 in contract cases.[37] Thus, the Reliance policies require the same analysis which the Court has already done. That analysis favors the law of North Carolina because that state has the "most significant relationship" to the parties and policies at issue in this case for the reasons I have already stated.

## III. CONCLUSION

The interests of economy, ease of application, and uniformity of result favor a global choice of law in this case at this time. North Carolina has the "most significant relationship" to the transactions and the parties at issue in this case. The Court therefore concludes that the rights and duties of the parties with respect to the policies at issue in this case shall be determined by the law of North Carolina.

**IT IS SO ORDERED.**

37. *Id.*