IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE TRAVELERS INDEMNITY COMPANY, | § § § | No. 420, 2017 |
| Defendant-Below, Appellant, | § § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | C.A. No. N12C-07-108 |
| CNH INDUSTRIAL AMERICA, LLC, | § § | |
| Plaintiff-Below, Appellee. | § § § | |

Submitted: May 9, 2018
Decided: July 16, 2018

Before **STRINE**, Chief Justice; **SEITZ**, and **TRAYNOR**, Justices.

## <u>ORDER</u>

(1)     This is an insurance coverage dispute between the Travelers Indemnity Company and CNH Industrial America, LLC.  CNH seeks coverage from Travelers for historic asbestos-related liabilities at J.I. Case, Inc., some of whose assets were transferred to CNH during a 1994 corporate reorganization.  The focus of this appeal is one issue—whether three Travelers insurance policies issued in 1972, 1978, and 1985 were validly assigned to CNH by J.I. Case's former parent, Tenneco, Inc., as part of the 1994 corporate reorganization.  The validity of the assignments, in turn, depends on the state law governing the dispute.  If Wisconsin law applies, where J.I. Case was headquartered, CNH can overcome the policies' anti-assignment

provisions. If Texas law applies, where Travelers claims the policies were negotiated, contracted, and performed, CNH concedes that the policies were not properly assigned to it by Tenneco during the reorganization, negating coverage.

(2) Because the insurance policies were silent on choice of law, the Superior Court applied the "most significant relationship" test in the *Restatement (Second) of Conflict of Laws*. It decided that J.I. Case, and not Tenneco, was the relevant party to focus on to resolve the choice of law question. Of the *Second Restatement* factors, the Superior Court gave the greatest weight to J.I. Case's principal place of business in Wisconsin, and applied Wisconsin law to the coverage dispute.

(3) After the Superior Court's choice of law ruling, this Court decided *Certain Underwriters at Lloyds, London v. Chemtura Corp.*[1] In *Chemtura*, insurance policies covering environmental claims were part of a comprehensive insurance program addressing risks across corporate operations in multiple jurisdictions. The policies were silent on choice of law. We emphasized that, when applying the *Second Restatement* factors to a corporate-wide insurance program, the inquiry should center on the insurance contracts and not the underlying claims. Otherwise, the insurance policies could be subject to different interpretations depending on the state law where each claim arose. We also held that the contracting

---

[1] 160 A.3d 457 (Del. 2017).

parties' intentions at the time of contracting were best met by applying a consistent body of law across all the policies. Because New York was the insured's principal place of business and the center of its insurance activities, New York had the most significant relationship to the dispute and thus its law governed the coverage issues.

(4)     We follow *Chemtura* to decide this appeal. Tenneco, a Texas-based company, sought insurance coverage from Travelers through a corporate-wide insurance program covering operations across multiple jurisdictions. Tenneco negotiated and secured insurance coverage, and managed its insurance program, out of its Texas offices. Thus, under the *Second Restatement* factors, Texas has the most significant relationship to the contracting parties and the dispute, and Texas law applies. Because the parties agree that Tenneco's assignment of the policies to CNH without Travelers's consent is invalid under Texas law, we reverse the Superior Court's decision and direct that judgment be entered in favor of Travelers.

## Background Facts

(5)     Tenneco Inc. is an oil and gas corporation with its headquarters, principal place of business, and insurance department located in Houston, Texas. In 1970, Tenneco acquired J.I. Case, a Wisconsin corporation with its headquarters and principal place of business in Racine, Wisconsin.

(6)     Before the acquisition, J.I. Case secured insurance coverage through CNA Financial. Its CNA Financial policies expired in 1972, at which time Tenneco

3

purchased for J.I. Case a one-year insurance policy through The Travelers Indemnity Company, with J.I. Case as the named insured.[2]  After that year, Tenneco added J.I. Case to its general insurance policies.[3]  The policies were part of an insurance program that existed from 1971 to 1986 and covered Tenneco and its wholly owned subsidiaries located in various states.[4]  Insurance broker Marsh & McLennan negotiated the policies with Tenneco in Texas, where the policies were purchased, delivered, and managed.[5]  In addition, Texas "was the central contact for all underwriting and claims issues, including those related to J.I. Case."[6]

---

[2] App. to Opening Br. at 434–39 (Gary C. Bennett Aff., *CNH Indus. Am., LLC v. Am. Cas. Co. of Reading, Pa. et al.*, No. N12C-07-108, at ¶¶ 3–4, 6–21 (Del. Super. Oct. 15, 2014)).  The Superior Court disregarded certain paragraphs of the Bennett affidavit.  *See id.* at 1962–69 (Order on Mot. to Strike Aff., *CNH Indus. Am., LLC*, No. N12C-07-108 (Del. Super. Mar. 10, 2015)).  Although Travelers has appealed the Superior Court's refusal to consider the stricken paragraphs, it is unnecessary to decide the issue to resolve this appeal.

[3] *Id.* at 503–07 (Tenneco Ins. Pol'y, Jan. 1, 1973–Jan. 1, 1974).

[4] The subsidiaries included Kern County Land Co. in California, Newport News Shipbuilding in Virginia, Petro-Tex in Texas, Tenneco Automotive in Illinois, and J.I. Case in Wisconsin.  *Id.* at 434 (Bennett Aff. ¶ 4).

[5] *Id.* at 2168 (Tr., *CNH Indus. Am., LLC*, No. N12C-07-108, at 12 (Del. Super. May 18, 2015)) ("[T]he facts demonstrate that the place of contracting is Texas.  That would be the last act that would have brought together the whole agreement.  The place of the negotiation of the contract, again, would be Texas."); *id.* at 1246 (Letter from Gary C. Bennett, Account Exec., to Harold Newell, Aug. 14, 1979); *id.* at 1248 (Letter from Jack Allyn, Assistant Vice President, to A.F. Fanning, Field Audit Manager, Feb. 18, 1971); *id.* at 445 (Bennett Aff. ¶ 44) ("Information collected by Travelers during the underwriting process demonstrates the Tenneco Insurance Program was entirely managed by Tenneco through the company's Property & Casualty Insurance Department, located at the corporate headquarters in Houston, Texas.  Donald C. Baughman and J.E. Brewster were the primary points of contact at Tenneco for the entire account, and, in that role, functioned [as] the primary contact for Travelers with regard to all underwriting and claim processing requests for the Tenneco Insurance Program."); *id.* at 2172 (Tr., at 26) (acknowledging that Tenneco wrote the checks for the insurance policies in Texas).

[6] *Id.* at 440 (Bennett Aff. ¶ 29).

4

(7)     Each of the Travelers policies included an anti-assignment provision: "Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon."[7]  In 1994, J.I. Case assigned certain assets and liabilities to CNH Industrial America, LLC, a Delaware limited liability company formed in 1994 with its principal place of business in Racine, Wisconsin.[8]  CNH claims that insurance coverage was part of this assignment.[9]  Neither Tenneco, J.I. Case, nor CNH sought Travelers' consent to assign to CNH the policies covering J.I. Case.[10]

(8)     In 2012, CNH filed suit against Travelers, CNA Financial, and other primary insurers, seeking coverage for defense costs and losses incurred in defending asbestos-exposure suits.  CNH filed a motion for summary judgment directed at CNA Financial, asserting that it was covered under CNA Financial's policies issued to J.I. Case from 1965 to 1971.  The Superior Court held that Wisconsin law governed the CNA Financial insurance policies, but specifically stated that its decision did not apply to the Travelers policies—"[t]his opinion addresses only the issue of the CNA Defendants' duty to defend in connection with the three policies.  It does not address and is without prejudice to the rights or

---

[7] *See*, *e.g.*, *id.* at 532 (Tenneco Ins. Pol'y at 2, Jan. 1, 1972–Jan. 1, 1973).

[8] *Id*. at 1410–11 (Reorganization Agreement, at 35–36 (June 23, 1994)).

[9] Opening Br. at 15 (citing App. to Opening Br. at 1372–1414 (Reorganization Agreement)).

[10] *See* App. to Opening Br. at 1349 (CNH's Resp. to Reqs. for Admis., *CNH Indus. Am., LLC*, No. 12C-07-08, at 13 (Del. Super. June 9, 2014)) ("CNH admits that it did not ask Travelers to consent to the assignment of rights under the Travelers Policies from Tenneco to Case Equipment Corporation.").

liabilities or any other party or any other policies."[11]  After the court's order, CNH and CNA Financial settled their coverage dispute.

(9)     Turning to Travelers, CNH argued it was covered under three policies: a policy specific to J.I. Case from January 1, 1972 to January 1 1973,[12] and two Tenneco general liability policies, one from January 1, 1978 to September 1, 1978,[13] and the other from September 1, 1985 to September 1, 1986.[14]  Travelers filed a motion for summary judgment on the choice of law, arguing that Texas law should apply because the insurance policies were negotiated, paid for, and managed by Tenneco in Texas.  In response, CNH argued that Wisconsin law should apply because J.I. Case and not Tenneco was the relevant party to the dispute, and the events giving rise to the asbestos lawsuits occurred in Wisconsin where J.I Case had its manufacturing operations.

(10)   The Superior Court denied Tenneco's summary judgment motion but decided the choice of law issue.  Applying the *Second Restatement* factors, the court found the most important factor was the insured's primary place of business.

[11] *CNH Am., LLC v. Am. Cas. Co. of Reading, Pa.*, 2014 WL 626030, at *1 (Del. Super. Jan. 6, 2014)).

[12] App. to Opening Br. at 527–653 (J.I. Case Ins. Pol'y, Jan. 1, 1972–Jan. 1, 1973); *see also id.* at 452 (Letter from Raymond Hayes, Assistant Sec'y, Tenneco, to George Cihla, Marsh & McLennan, Inc., Feb. 17, 1972) ("Effective January 1, we now cover the Tenneco 'family' as expiring on 1-1-72 with the exception that the following members are now included for coverage: J.I. Case.").

[13] *Id.* at 739–68 (Tenneco Ins. Pol'y, Sept. 1, 1977–Sept. 1, 1978).

[14] *Id.* at 1089–1122 (Tenneco Ins. Pol'y, Sept. 1, 1985–Sept. 1, 1986).

According to the court, even though Tenneco contracted, negotiated, and purchased the policies in Texas, Tenneco was not the relevant party in this dispute.[15] Instead, "it was J.I. Case, a Wisconsin corporation, that was the insured and that possessed the indemnification rights against Travelers that CNH now seeks to enforce."[16] J.I. Case's principal place of business was "the situs which link[ed] all the parties together,"[17] and thus, Wisconsin had the most significant relationship to the parties and the subject matter.

(11) The Superior Court held that, under Wisconsin law, Tenneco validly assigned the policies to CNH. After further proceedings, the Superior Court entered judgment against Travelers for $13,714,989.11. Travelers has appealed several of the Superior Court's rulings. Because the choice of law issue is dispositive, we need not reach the other issues on appeal. This Court reviews the grant of a motion for summary judgment *de novo*.[18]

### The *Chemtura* Decision

(12) As we noted in *Chemtura*, there are three threshold elements to the choice of law analysis:

> i) determining if the parties made an effective choice of law through their contract; ii) if not, determining if there is an actual conflict

---

[15] *Id.* at 2167–70 (Tr., at 8–12).
[16] *Id.* at 2171 (Tr., at 21).
[17] *Id.* at 2169 (Tr., at 16).
[18] *Chemtura Corp.*, 160 A.3d at 464.

between the laws of the different states each party urges should apply; and iii) if so, analyzing which state has the most significant relationship.[19]

Here, the parties did not choose the law to be applied to the policies. And there is an actual conflict between the laws of Texas and Wisconsin regarding the effect of the policies' anti-assignment provisions.[20] Thus, the *Second Restatement*'s most significant relationship factors control the choice of law issue.

(13) In *Chemtura* we re-evaluated how the *Second Restatement* factors should be applied to a dispute involving a comprehensive corporate insurance program. We traced the *Second Restatement*'s "three layers of guidance for determining the state with the most significant relationship to the dispute and thus the applicable state law."[21] At the first layer, the court looks to the presumption in

---

[19] *Id.*

[20] Texas enforces anti-assignment provisions, while Wisconsin permits some post-loss assignments without the insurer's consent—regardless of any anti-assignment provision. *Compare Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 556 (Tex. 1986) (finding that when an insurance policy contains an anti-assignment clause, any assignment without the insurer's consent, "whether absolute or collateral, would be of no force and effect") *with Dogge v. Nw. Nat. Ins. Co.*, 5 N.W. 889, 890 (Wis. 1880) ("But that is certainly a mistaken view of the matter; for, although the policy provides that an assignment thereof, without the consent of the company, will avoid the contract, yet the law is well settled that this only applies to an assignment before a loss under it."); *see also Straz v. Kansas Bankers Sur. Co.*, 986 F. Supp. 563, 569 (E.D. Wis. 1997), *aff'd*, 165 F.3d 33 (7th Cir. 1998) ("Moreover, any construction of an insurance policy which purports to prohibit assignment of such a claim would be contrary to public policy and void."); *Keller Founds., Inc. v. Wausau Underwriters Ins. Co.*, 626 F.3d 871, 874 (5th Cir. 2010) (applying Texas law and finding that "the non-assignment clause bars any assignment of the coverage without [the insurer's] approval, rendering invalid any transfer that might have taken place").

[21] *Chemtura Corp.*, 160 A.3d at 465.

8

§ 193, which states that "[t]he validity of a contract of . . . insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy."[22] The presumption, however, "does not apply to policies [that] provide broad-based coverage across many jurisdictions for a company's enterprise-wide risks.[23] This is because § 193 "makes assumptions . . . that the term of the insurance policy will be 'relatively brief,' that it is possible to predict 'with fair accuracy where the risk will be located,' and that the risk is likely something singular and tangible, an 'immoveable object' or 'particular building'"—assumptions that do not apply to a "complex, multistate insurance program" like the one at issue here.[24] Thus, when addressing a comprehensive insurance program, "§ 193's presumption is, at best, directionally helpful but arguably not conclusive."[25] Rather, "§ 188's factors are the most appropriate way to determine the appropriate law."[26]

(14)  At the second layer, "[f]or contract disputes more broadly"—such as here, where the insured risk is spread across multiple states—the court should weigh the five factors set out in § 188: "(a) the place of contracting, (b) the place of

---

[22] Restatement (Second) of Conflict of Laws § 193.

[23] *Chemtura Corp.*, 160 A.3d at 465; *see id.* at 459 ("Because we see this dispute as one fundamentally about the meaning of a contract that composed part of a comprehensive, nationwide insurance program, we reject the Superior Court's analysis of the site-of-the-risk presumption.").

[24] *Id.* at 466 (quoting Restatement (Second) of Conflict of Laws § 193 cmt. b).

[25] *Id.* at 467.

[26] *Id.*

negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."[27]

(15) Before applying the § 188 factors in *Chemtura*, we highlighted three important issues for framing the analysis.[28] First, when dealing with a corporate insurance program covering risks across many jurisdictions, the dispute is not about the underlying claims triggering the insurance coverage. Rather, it is better described as a contract dispute involving interpretation of the insurance policies. And the justified expectations of the parties are "best served by providing terms in the contract with a meaning that does not vary based on the happenstance of the locations of a particular claim."[29] Second, the subject matter of the contracts is not the narrow coverage claims regarding liability at two specific sites. Instead, the subject matter is the policies that "provide expansive non site-specific coverage, throughout the United States."[30] Thus, the court should not be constrained by the particular claims in a suit when deciding the choice of law issue. And third, the proper time to assess the reasonable expectation of the parties is at the time the contract was formed, which protects the reasonable expectation of the parties. In

---

[27] Restatement (Second) of Conflict of Laws § 188(2).
[28] *Chemtura Corp.*, 160 A.3d at 467.
[29] *Id.*
[30] *Id.*

10

*Chemtura*, the § 188 factors all pointed to New York because it was the place of contracting, place of negotiation, place of performance, and the insured's principal place of business.[31]

(16)   And finally, we weighed the § 188 factors in light of the policy interests in § 6 of the *Second Restatement*, focusing on the parties' expectations and consistency in the law's application to the policies.[32]  We explained that because the insurance program in *Chemtura* was "a comprehensive, nationwide insurance scheme that would invariably involve underlying claims from multiple states,"[33] applying New York law would "best avoid a result that not only would require the meaning of the contract to vary arbitrarily," but would not be contrary to the parties' initial expectations."[34]   Thus, applying a single state's law ensured "certainty, predictability and uniformity of result[s],"[35] avoiding the "risk of a court

---

[31] *Id.* at 468; *see* Restatement (Second) of Conflict of Laws § 188(2)(a)–(e).

[32] *See Chemtura Corp.*, 160 A.3d at 468 ("[Section] 188's factors are meant to be considered in conjunction with § 6."); Restatement (Second) of Conflict of Laws § 188 (listing the following factors: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.").

[33] *See Chemtura Corp.*, 160 A.3d at 471 ("Insurance programs like this one are intended to work together to provide overall protection to the insured.").

[34] *Id.*; *see* Restatement (Second) of Conflict of Laws § 188(2)(d), (g).

[35] Restatement (Second) of Conflict of Laws § 188(f); *see Chemtura Corp.*, 160 A.3d at 470 (noting that "[t]he alternative would result in a court being forced to inconsistently apply the same contract language based on the happenstance of remaining sites with liability and the meaning of certain terms varying only on that happenstance").

11

inconsistently applying identical policy language within a single integrated insurance scheme."[36]

## Applying *Chemtura* to this Appeal

(17) When *Chemtura*'s *Second Restatement* analysis is applied to this appeal, Texas has the most significant relationship to the parties and the dispute. As noted before, the § 193 presumption is entitled to little if any weight because the Travelers policies were part of a "complex, multistate insurance program" that provided "broad-based coverage across many jurisdictions."[37] Thus, we turn to the § 188 factors, which we apply based on Tenneco's role as the contracting party with Travelers. Those factors point strongly towards Texas. As the Superior Court found, Tenneco and Travelers negotiated the insurance policies in Texas; paid the premiums from Texas; and managed the insurance program from Texas,[38] where Tenneco is domiciled, incorporated, and conducts business.[39]

---

[36] *Chemtura Corp.*, 160 A.3d at 471 (quoting *Viking Pump, Inc. v. Century Indem. Co.*, 1 A.3d 76, at 88–89 (Del. 2009)); *see id.* at 460 ("This result not only gives effect to the *Second Restatement*'s policies for contracts generally, but also fulfills the need for comprehensive insurance programs to have a single interpretive approach utilizing a single body of law unless the parties to the scheme choose otherwise.").

[37] *Id.* at 465; *see*, *e.g.*, App. to Opening Br. at 503–05 (listing subsidiaries covered by Tenneco insurance policies); *id.* at 1147–50 (Letter from George Cihla, Marsh & McLennan, to Raymond Hayes, Assistant Sec'y, Travelers, Nov. 19, 1971) (obtaining prices from Marsh & McLennan regarding coverage for numerous Tenneco subsidiaries); *see id.* at 452 (Letter from Raymond Hayes, Assistant Sec'y, Tenneco, to George Cihla, Marsh & McLennan, Inc., Feb. 17, 1972) (providing payment for coverage of the Tenneco "family").

[38] *See* Restatement (Second) of Conflict of Laws § 188(2)(a)–(c).

[39] *See id.* § 188(2)(e).

(18)    We also consider the § 188 factors in light of the policy interests in § 6 of the *Second Restatement*. In *Chemtura*, we focused on § 6(c), which looks at the states' interests in applying their law to the interpretation of the contract.[40] We found that Arkansas' and Ohio's interests in determining the issue were "not as extensive as the Superior Court determined,"[41] because the issue at hand was not whether "a party would be liable for pollution cleanup" nor whether "the state where the pollution occurred will be left on the hook."[42] Rather, the issue was which state had "a material enough interest in [the] contract dispute to upend the expectations of the parties."[43] We held that New York had the more significant interest as the principal place of business where the coverage began. In this case, the question is which state has a material interest in applying its law to the interpretation of the insurance contracts—not the asbestos liabilities. The policies were negotiated, contracted and managed in Texas, where coverage of all of Tenneco's business began; thus, Texas has the more material interest.

---

[40] *Chemtura Corp.*, 160 A.3d at 468; *see* Restatement (Second) of Conflict of Laws § 6(a)–(c).

[41] *Chemtura Corp.*, 160 A.3d at 469 ("The Superior Court stated that Arkansas and Ohio 'have a vested interest in having their laws apply to these policies.' But, neither the Superior Court nor Chemtura explain how those interests extend beyond an interest in ensuring that someone can be held liable for any additional cleanup. . . . [T]his dispute is about allocating liability between two parties . . . ." (quoting *Chemtura Corp. v. Certain Underwriters at Lloyd's*, 2016 WL 3884018, at *5 (Del. Super. Apr. 27, 2016))).

[42] *Id.* at 468.

[43] *Id.*

(19)   Section 6 also requires us to consider the parties' expectations at the time of contracting.[44]  As noted in *Chemtura*, protecting the parties' expectations is "of considerable importance" in contract disputes[45] and "is best served by providing terms in the contract with a meaning that does not vary based on the happenstance of the locations of a particular claim."[46]  Here, applying the law where each Tenneco subsidiary was located could allow "the meaning of the contract[s] to vary arbitrarily."[47]  Applying the law of Texas, which has the most significant relationship to the parties and the dispute, maintains "certainty, predictability and uniformity"[48] in interpreting the insurance contracts and provides "ease in the determination and application of the law."[49]

## CNH's Arguments on Appeal

(20)   CNH's main argument on appeal is that J.I. Case was the relevant party to the dispute, and thus the *Second Restatement* analysis should focus on J.I. Case's location—not Tenneco's.[50]  CNH argues that under § 193, the "insured risk" covered by the policies was specific to J.I. Case's facilities in Wisconsin, and thus Wisconsin

---

[44] Restatement (Second) of Conflict of Laws § 6(d).

[45] *Chemtura Corp.*, 160 A.3d at 468 (quoting Restatement (Second) of Conflict of Laws § 188 cmt. b).

[46] *Id.* at 467.

[47] *Id.* at 467–68.

[48] Restatement (Second) of Conflict of Laws § 193(2)(e).

[49] *Id.* § 188(2)(f).

[50] Answering Br. at 29 ("The Superior Court had ample justification for finding that J.I. Case, not Tenneco, is the pivotal party in this coverage dispute.").

14

has the most significant relationship to the dispute.[51] Tenneco, it claims, "has no involvement in the underlying claims or relationship to the coverage dispute."[52]

(21) As noted earlier, *Chemtura* addressed how the *Second Restatement* should be applied to coverage disputes involving insurance programs that cover risks across a corporation's operations. Instead of looking to § 193, which is typically applied to one-off policies for site-specific risks, the court should instead apply the § 188 factors, focusing on the insurance program itself and where the parties negotiated and managed the program. Here, Tenneco—not J.I. Case—negotiated and managed its comprehensive insurance program from Texas.[53]

(22) CNH also argues that its principal place of business should determine the choice of law under § 188 because the conduct giving rise to the asbestos injuries occurred in Wisconsin[54] and the plaintiffs brought their claims against J.I. Case— not Tenneco.[55] But, in *Chemtura* we explained that, when dealing with a

---

[51] *Id.*; *see* Restatement (Second) of Conflict of Laws § 193 ("The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy . . . .").

[52] Answering Br. at 33.

[53] *See*, *e.g.*, App. to Opening Br. at 452, 1133–1281 (letters between Tenneco's Texas offices, Marsh & McLennan, and Travelers).

[54] Answering Br. at 29 ("J.I. Case . . . produced and manufactured the agricultural and construction equipment that caused the injury." (quoting App. to Opening Br. at 2170 (Tr., at 17))).

[55] *See id.* at 32 ("[T]he most significant factor for conflict of laws analysis in a complex insurance case with multiple insurers and multiple risks is the principal place of business of the insured because it is 'the situs which link[s] all the parties together.'" (quoting *Liggett Grp., Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134, 138 (Del. Super. 2001))).

15

comprehensive insurance program, the subject matter of an insurance coverage dispute is not the conduct that gave rise to the underlying injuries, but rather the alleged breach of the insurance policies.[56] Thus, the relevant location is the place of contracting, not the place where the conduct causing the injuries occurred or where the underlying claims are brought.[57]

(23)   CNH argues that the *Second Restatement*'s § 6 principles are applied to determine the "law *applicable to an issue*,"[58] and the "issue" in this case "center[ed] primarily on a single policy that Travelers separately issued in Wisconsin to J.I. Case alone."[59]  It claims that in its complaint, it "sought relief solely under the J.I. Case policy, not any other policies."[60]  The record demonstrates otherwise.  CNH sought coverage under three policies procured by Tenneco, one that specifically covered J.I. Case and two that were broad liability policies covering Tenneco and its

---

[56] *See Chemtura Corp.*, 160 A.3d at 467 ("[T]he subject matter of the contract itself is not as narrow as the Superior Court seemed to understand it.  Chemtura and the Superior Court read the contract narrowly to constrain its subject matter for this analysis to the remaining liability at the Arkansas and Ohio sites.  Today, claims at those sites might be the only remaining claims on the policies, but the policies were intended to provide expansive non site-specific coverage, throughout the United States in some instances, and 'anywhere in the World' in others.").

[57] *Id.* at 468.

[58] Answering Br. at 30 (quoting Restatement (Second) of Conflict of Laws § 188(2)) (emphasis original); *see id.* at 33 ("The link to Tenneco's insurance program in Texas for only some of the policies at issue in the case, can hardly be deemed the most significant factor for choice-of-law purposes here.").

[59] *Id.* at 29.

[60] *Id.* at 35; *see also* Reply Br. at 2 ("CNH therefore vainly attempts for the first time on appeal to divorce the J.I. Case policy from the rest of the Tenneco Insurance Program.").

16

subsidiaries.[61] CNH did not argue before the Superior Court that the J.I. Case policy was separate from Tenneco's insurance program; rather, it argued that Wisconsin law should apply to all three policies.[62] In addition, the Superior Court did not limit its holding to the separate J.I. Case policy, but addressed the insurance program as a whole, noting that while only one of the three policies specifically named J.I. Case as the insured,[63] "Wisconsin law should apply to the other insurance policies as well."[64] Regardless, "in the case of a comprehensive insurance scheme made up of several different policies . . . , the *Restatement* analysis should be applied to the contracts as a whole."[65] The policies, when considered as a whole, were procured, negotiated, paid for, and managed in Texas under Tenneco's insurance program.

(24) Although the Superior Court held that J.I. Case's principal place of business was the key factor in the most significant relationship test, the court also acknowledged that "[t]he facts demonstrate that the place of contracting is Texas,"

---

[61] App. to Opening Br. at 2424 (Second Am. Compl. ¶ 46).

[62] *Id.* at 1498 (Pl.'s Answering Br., *CNH Indus. Am., LLC*, No. N12C-07-108, at 14 (Del. Super. Dec. 10, 2014)) ("The choice-of-law analysis should reach the same result with respect to the Tenneco Policies. All of those policies include J.I. Case as a 'named insured' and cover periods when J.I. Case had its principal place of business in Wisconsin.").

[63] *See id.* at 2424 (Second Am. Compl. ¶ 46); *see also id.* at 2169–70 (Tr., at 16–17) ("J.I. Case was also an insured under 12 other general liability insurance policies . . . although not directly named in the policy. Each of the 12 policies lists Tenneco as the named insured. However, review of the insurance policy shows that J.I. Case is also an insured under the policy [as a subsidiary].").

[64] *Id.* at 2170 (Tr., at 17).

[65] *Viking Pump, Inc.*, 2 A.3d at 88.

which was "the last act that would have brought together the whole agreement."[66] The court also acknowledged that "[t]he place of the negotiation of the contract, again, would be Texas."[67] Now on appeal, CNH argues that the relationship between J.I. Case and Travelers was "direct, extensive, and centered in Wisconsin and independent of Travelers' relationship with Tenneco."[68] To support its argument, it points to 1974 Special Account Instructions for the policies, which stated that product loss claims after 1974 would be reported in Wisconsin, and also to a Travelers liaison in Wisconsin who would coordinate with J.I. Case.[69]

(25) The instructions, however, apply to Tenneco's comprehensive insurance program, providing procedures for each subsidiary to "conform to specific requirements of several major divisions, and to conform to more general requirements applicable to all other Tenneco subsidiaries."[70] The instructions varied in some ways—explaining how certain claims would be handled and who the contacts would be at each subsidiary. The instructions, however, mainly provide general procedures for Tenneco and all the subsidiaries, with Tenneco handling most

---

[66] App. to Opening Br. at 2168 (Tr., at 12); *id.* at 2172 (Tr., at 26) (acknowledging that Tenneco wrote the checks for the insurance policies in Texas); *see also id.* at 445 (Bennett Aff. ¶ 44).

[67] *Id.* at 2168 (Tr., at 12).

[68] Answering Br. at 12.

[69] *Id.* at 34; App. to Answering Br. at 5645 (Special Account Instructions, at 3 (Jan. 1, 1974)).

[70] App. to Answering Br. at 5642 (Special Account Instructions, at 1).

claims and reports from its Houston headquarters.[71]  The Special Account Instructions do not support J.I. Case's argument that its relationship with Travelers was "independent of Travelers' relationship with Tenneco."[72]  Rather, the instructions explicitly state that the "Travelers policies issued to *Tenneco, Inc.* provide coverage for all affiliated or subsidiary companies."[73]  The policies covered by the 1974 Special Account Instructions were issued to Tenneco—not J.I. Case. J.I. Case's coverage was part of a comprehensive company-wide insurance program managed by Tenneco from its Texas headquarters.

(26)  Finally, CNH argues that applying Texas law is contrary to Delaware public policy.[74]  CNH asserts that "[t]here is no reason to believe that the public policy of Delaware . . . would favor hamstringing sales of corporate assets or voiding insurance coverage already bought and paid for, to the potential detriment of tort plaintiffs."[75]  According to CNH, applying Texas law, which does not recognize the assignment, "would bring about the very type of insurance forfeiture and insurance company windfall that Delaware courts have long disfavored."[76]  CNH relies on

---

[71] *Id.* at 5659–65 (Special Account Instructions, at 17–23) (listing the forms, reports, and claims to be sent to and from Tenneco's Houston headquarters).

[72] Answering Br. at 12.

[73] App. to Answering Br. at 5664 (Special Account Instructions, at 22) (emphasis added).

[74] Answering Br. at 43–44 (citing *Sinnott v. Thompson*, 32 A.3d 351, 357 (Del. 2011); *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010)).

[75] *Id.* at 44.

[76] *Id.*

*Viking Pump Inc.*, in which the Court of Chancery declined to enforce an anti-assignment provision because it would violate New York public policy.[77]  But, the court's decision in *Viking Pump, Inc.* was based on "well-established" New York law and not an independent analysis of whether enforcement of the provision would violate New York—or Delaware—public policy.[78]  There is no established Delaware law that anti-assignment provisions in insurance contracts are against public policy.

## Conclusion

CNH concedes that under Texas law, J.I. Case's assignment of the Travelers insurance policies to CNH without Travelers's consent is invalid.[79]  Thus, the Travelers' insurance policies do not provide coverage for CNH's claims.

---

[77] *Viking Pump, Inc.*, 2 A.3d at 104; *see id.* at 105–06 ("The majority's conclusion in [*Henkel Corp. v. Hartford Accident & Indem. Co.*, 62 P.3d 69 (Cal. 2003)] is also at odds with New York's public policy, because it could hamstring markets for the sale of corporate assets and lead to insufficient recoveries for tort plaintiffs in situations when insurance to cover the plaintiffs' claims was bought and paid for." (citations omitted)).

[78] *Viking Pump, Inc.*, 2 A.3d at 106 n.92 ("Enabling efficient exchange appears to be a long-standing public policy rationale for New York law's rule against enforcing anti-assignment provisions in post-loss scenarios."); *see also J.S. Alberici Const. Co., Inc. v. Mid-West Conveyer Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("[T]here is corollary policy in favor of recognizing and enforcing rights and duties validly created by a foreign law.  A mere difference between the laws of two states will not necessarily render the enforcement of a cause of action arising in one state contrary to the public policy of another." (internal citation omitted)).

[79] Oral Argument at 23:02, *Travelers Indem. Co. v. CNH Indus. Am., LLC*, No. 420, 2017 (Del. May 9, 2018), https://courts.delaware.gov/supreme/oralarguments/ (Q. "Do you agree that on this record that if Texas law does apply, that the anti-assignment law applies and you're out of luck?" A. "Yes."); App. to Opening Br. at 2170 (Tr., at 19) ("Travelers never consented to the assignment of the interest to CNH.  Under Texas law, the anti-assignment provision is effective, and CNH would have no interest in the other insurance policies."); *Island Recreational Dev. Corp.*, 710 S.W.2d at 556 ("[T]he terms of the paragraph in question the letter of commitment was not assignable without [the insurer's] consent. Thus, any attempted assignment, whether absolute or collateral, would be of no force and effect."); *Tex. Farmers Ins. Co. v. Gerdes by & Through*

NOW, THEREFORE, it is hereby ORDERED that the judgment of the Superior Court is REVERSED. The Superior Court is directed to enter judgment in favor of The Travelers Indemnity Company and against CNH Industrial America, LLC.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Justice

---

*Griffin Chiropractic Clinic*, 880 S.W.2d 215, 219 (Tex. App. 1994) ("[T]he named insured is barred from assigning his rights without the written consent of the insurer."); *Keller Founds., Inc.*, 626 F.3d at 874 (applying Texas law and finding that "the non-assignment clause bars any assignment of the coverage without [the insurer's] approval, rendering invalid any transfer that might have taken place").