# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RSUI INDEMNITY COMPANY, | § | |
| | § | No. 154, 2020 |
| Plaintiff Below, | § | |
| Appellant/Cross-Appellee, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. N16C-01-104 CCLD |
| DAVID H. MURDOCK and DOLE | § | |
| FOOD COMPANY, INC., | § | |
| | § | |
| Defendants Below, Appellees/ | § | |
| Cross-Appellants. | § | |

Submitted: December 16, 2020
Decided: March 3, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

Robert J. Katzenstein, Esquire, Kathleen M. Miller, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Robert P. Conlon, Esquire (*argued*), Kevin A. Lahm, Esquire, Cassandra L. Jones, Esquire, WALKER WILCOX MATOUSEK LLP, Chicago, Illinois, *for Appellant RSUI Indemnity Company*.

Elena C. Norman, Esquire, Mary F. Dugan, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Kirk A. Pasich, Esquire (*argued*), Pamela Woods, Esquire, Christopher T. Pasich, Esquire, PASICH LLP, Los Angeles, California, *for Appellees David H. Murdock and Dole Food Company, Inc.*

**TRAYNOR**, Justice:

An excess insurer under a directors' and officers' liability insurance policy sought a declaration from the Superior Court that coverage under the policy was not available to fund the settlement of two lawsuits—a breach of fiduciary duty action in the Court of Chancery and a federal securities action in the United States District Court for the District of Delaware. In a series of decisions, the Superior Court rejected the insurer's claims and entered judgment in favor of the insureds.

In this appeal, the insurer contends that the Superior Court committed several errors along the way. The purported errors we take up in this opinion include: whether the insurance policy, which insures a Delaware corporation and its directors and officers but which was negotiated and issued in California, should be interpreted under Delaware law; whether the policy, to the extent that it appears to cover losses occasioned by one of the insureds' fraud, is unenforceable as contrary to the public policy of Delaware; whether a policy provision that excludes coverage for fraudulent actions defeats coverage; and whether the Superior Court properly applied the policy's allocation provision.

For the reasons that follow, we hold that the Superior Court resolved each of these issues correctly; therefore, we AFFIRM.

I.

A.

Dole Food Company, Inc. ("Dole") holds a $15,000,000 directors, officers, and corporate liability insurance policy (generically, a "D&O policy") issued by AXIS Insurance Company ("AXIS"). RSUI Indemnity Company ("RSUI"), among other insurers (together with AXIS and RSUI, the "Insurers"[1]), provides excess D&O policy coverage to Dole in policies that follow form to Dole's policy with AXIS (the "Policy"[2]). RSUI is Dole's eighth layer of D&O coverage, providing $10,000,000, payable upon the exhaustion of the $75,000,000 coverage from the underlying policies and the payment of a $500,000 retention by Dole. RSUI is the only insurer involved in this appeal. All other Insurers have paid their policy limits or settled with Dole.

The Policy provides, in relevant part, that the Insurers "shall pay on behalf of the **Insured Individual** all **Loss** which is not indemnified by [Dole] . . . arising from

---

[1] Throughout the course of events leading to this coverage dispute and the underlying actions relevant to this appeal, variations of all or some of Dole's nine D&O policy insurers were involved. For ease of reference, we refer generally to Dole's D&O insurers as the "Insurers," but acknowledge that this is, at times, a less than accurate reference because of the various times at which each Insurer's coverage was exhausted, either by paying its policy limits or settling with Dole. Where necessary or appropriate, we refer specifically to RSUI.

[2] RSUI's excess policy follows form and incorporates the terms and conditions of the AXIS policy except as otherwise stated in the RSUI excess policy, which primarily provides additional terms that require the exhaustion of the underlying coverage before RSUI must pay its limits. For ease of reference, we refer to the policies collectively as the Policy.

3

any **Claim** for a **Wrongful Act**."[3] The Policy defines an "**Insured Individual**" as any persons who are or have been "duly elected or appointed director(s), officers(s), trustee(s) . . . or **Manager(s)** of [Dole] . . . [and] employees of [Dole] . . . who are named as defendants in any **Securities Claim**."[4] Under the Policy, a "**Wrongful Act**" is "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty by . . . any **Insured Individual**"[5] in their capacity as a director or officer. The Policy also covers "all **Loss** arising from any **Securities Claim** first made against [Dole]."[6] "**Loss**" is defined as "all monetary amounts which the **Insureds** become legally obligated to pay on account of a **Claim**, including damages, settlement amounts and judgments, including any award of punitive, exemplary or multiple damages, pre-judgment or post-judgment interest, costs and fees awarded pursuant to judgments, [and] **Defense Costs**."[7] Under Section IV.6 of the Policy:

> The Insurer shall not be liable for **Loss** on account of any **Claim**:
> . . .
> . . . based upon, arising out of or attributable to:
>> . . . any profit, remuneration or financial advantage to which the **Insured** was not legally entitled; or
>> . . . any willful violation of any statute or regulation or any deliberately criminal or fraudulent act, error or omission by the **Insured**;

---

[3] App. to Opening Br. at A447 (emphasis in original).
[4] *Id.* at A433; A449 (emphasis in original).
[5] *Id.* at A436 (emphasis in original).
[6] *Id.* at A448 (emphasis in original).
[7] *Id.* at A449 (emphasis in original).

if established by a final and non-appealable adjudication adverse to such **Insured** in the underlying action.[8]

If a covered "Loss" is incurred jointly with other insured parties or non-insured parties, Section VIII.A provides:

> the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of covered **Loss**. The Insurer's obligation shall relate only to those sums allocated to matters and **Insureds** which are afforded coverage. In making such determination, the parties shall take into account the relative legal and financial exposures of the **Insureds** in connection with the defense and/or settlement of the **Claim**.[9]

B.

In November 2013, David H. Murdock, director and CEO of Dole, took Dole private through a merger transaction in which Murdock acquired all of Dole's stock not already owned by him. Before the transaction, Murdock owned approximately 40% of Dole's stock. Murdock acquired the stock through a holding company that he controlled, DFC Holdings, LLC ("DFC"). The merger was approved by a 50.9% vote of disinterested stockholders, and the transaction closed in November 2013 with Dole stockholders receiving $13.50 per share.

After the merger closed, Dole stockholders filed a lawsuit in the Court of Chancery challenging the fairness of the transaction and alleging breach of fiduciary duty claims against Murdock and Dole's President, COO, and General Counsel, C.

---

[8] *Id.* at A452–53 (emphasis in original).
[9] *Id.* at A440–41 (emphasis in original).

5

Michael Carter (the "Stockholder Action"). The stockholders claimed that Murdock and Carter acted over the course of several months to manipulate the value of the company's stock, which enabled Murdock to acquire the stock at an artificially low price. The lawsuit was consolidated with another lawsuit initiated by other stockholders who sought appraisal of their shares.

In its memorandum opinion (the "Memorandum Opinion") following a nine-day trial, the Court of Chancery determined that Murdock and Carter had breached their duty of loyalty through a series of intentional, unfair, and fraudulent actions that, among other things, drove down Dole's pre-merger stock price, undermining it as a measure of value and hampering the Special Committee's negotiating position. The court found that "[t]he evidence at trial established that the Merger was not a product of fair dealing"[10] and "demonstrated that . . . [Murdock's and Carter's] actions were not innocent or inadvertent, but rather intentional and in bad faith."[11] According to the court, Carter had "engaged in fraud"[12] and "intentionally tried to mislead the [Special] Committee for Murdock's benefit,"[13] and that Murdock also "engaged in fraud"[14] and had "breached his duty of loyalty by orchestrating an

---

[10] *In re Dole Food Co., Inc. Stockholder Litigation*, 2015 WL 5052214, at *26 (Del. Ch. Aug. 27, 2015).
[11] *Id.* at *2.
[12] *Id.* at *26, 38, 46.
[13] *Id.* at *31.
[14] *Id.* at *46.

unfair, self-interested transaction."[15]   The court determined that "Murdock and Carter's . . . efforts to drive down the market price and their fraud during the negotiations reduced the ultimate deal price by 16.9%"[16] and found the two jointly and severally liable for $148,190,590.18—or $2.74 per share—in damages.

Recognizing that the appraisal claimants were entitled to the remedy provided by its decision, the acceptance of which might moot the appraisal demands, the Court of Chancery did not rule on the issue of appraisal.  Instead, the court directed the parties to confer and advise the court whether any issues remained to be addressed. Upon conferring, the parties began to discuss a settlement.  Dole, which had previously informed the Insurers of the Stockholder Action, provided the Insurers with an update of the settlement discussions.  All the Insurers responded with updated coverage positions, citing Policy exceptions, potentially precluding coverage, that were implicated by the Memorandum Opinion. The Insurers all reserved their rights regarding coverage.  Without further involvement by the Insurers, Dole and the stockholders settled both the plenary and appraisal matters, subject to the Court of Chancery's approval, for the full amount of damages awarded

---

[15] *Id.* at *39.
[16] *Id.* at *46.

by the Court of Chancery. The court approved the settlement and entered a final order and judgment. Murdock paid the settlement in full plus interest.

Meanwhile, and before the Court of Chancery approved the settlement, a federal securities class action (the "San Antonio Action") was initiated in the United States District Court for the District of Delaware by Dole stockholders who had sold their stock in Dole between January and October 2013 and were therefore not parties to the Stockholder Action.[17] Citing the findings of fraud and breach of loyalty in the Memorandum Opinion, the stockholders claimed that they were entitled to damages against Murdock, Carter, and Dole for violations of the Securities Exchange Act.[18]

Several months after the San Antonio Action was filed, the parties agreed to pursue mediation. Dole, having previously given notice of the action to the Insurers, informed the Insurers about the mediation and a potential settlement. The Insurers adopted coverage positions similar to those they had taken in the Stockholder Action. In its response, RSUI indicated that it would treat the Stockholder Action and the San Antonio Action as a single claim under the Policy. Without consent or confirmation of coverage from the Insurers, Dole negotiated a settlement of the San Antonio Action, under which the plaintiffs released the claims against the Insureds and Dole agreed to pay or cause to be paid $74,000,000 plus interest. After the

---

[17] *See San Antonio Fire & Police Pension Fund v. Dole Food Co., Inc.*, No. 1:15-CV-1140-SLR (D. Del. 2015).
[18] *See* 15 U.S.C. §§ 78j(b), 78(t)(a).

8

federal district court approved the settlement, Dole's insurer at the second layer of excess D&O policy coverage paid approximately $7,000,000 of the San Antonio Action settlement, exhausting Dole's third layer of coverage; Dole paid the remaining $66,000,000.[19]

C.

Following the Stockholder Action settlement, but before the Court of Chancery approved it and the San Antonio Action was settled, several of Dole's excess policy insurers, including RSUI, filed a lawsuit in the Superior Court seeking a declaratory judgment that they had no obligation to fund the settlement. In response, Murdock and Dole (the "Insureds") filed counterclaims against the Insurers alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud in the inducement. After the San Antonio Action was settled, the Insureds filed an amended counterclaim alleging that the Insurers had breached their duties by refusing to pay any part of the San Antonio settlement. Tackling a host of issues in response to pre-trial motions,[20] the Superior Court

---

[19] The record before us is silent regarding the extent to which the excess insurers other than RSUI indemnified Dole for this payment before the Superior Court entered its final judgment in this case. But we do know that by the time that judgment was entered on March 26, 2020, of the six Insurers that filed the declaratory-judgment action, RSUI was the only Insurer that had not paid its limits or settled with the Insureds.

[20] The rulings relevant to this appeal are found in several opinions issued over the course of a little over three years. On December 21, 2016, the Superior Court granted in part and denied in part the Insureds' Motion to Dismiss, ruling that Exclusion IV.6 of the Policy did not apply because the Memorandum Opinion was not a final and non-appealable adjudication and therefore could not

ultimately entered judgment in favor of the Insureds and against RSUI in the amount of $10,000,000—its policy limits—plus $2,321,095.90 in prejudgment interest.[21]

On appeal, RSUI claims that the Superior Court erred in four respects. First, RSUI claims that the Superior Court incorrectly concluded that Delaware law—and not California law—governs the interpretation of the Policy. Second, RSUI argues that, even if Delaware law were to apply, "Delaware law should . . . dictate that fraudulent conduct is uninsurable."[22] Third, RSUI claims that the Superior Court erred in its conclusion that Exclusion IV.6 of the Policy—what RSUI calls the "Fraud/Profit Exclusion"—did not defeat coverage for the settlement of the Stockholder Action and the San Antonio Action. Fourth and finally, RSUI contends that the Superior Court improperly applied the "larger settlement rule," contrary to

---

preclude coverage in this case. On March 1, 2018, the Superior Court granted in part and denied in part the Insurers' Motion for Summary Judgment, ruling that (1) collateral estoppel applies to the factual issues litigated and decided in the Memorandum Opinion, (2) Delaware law applies to the Policy, and (3) Delaware public policy does not preclude indemnification for the Insureds' fraud. On May 1, 2019, the Superior Court granted summary judgment in favor of the Insurers on the Insureds' counterclaim of breach of the implied covenant of good faith and fair dealing. On May 7, 2019, upon cross motions for summary judgment, the Superior Court held that the Stockholder Action settlement and the San Antonio Action settlement constituted a "Loss" under the Policy. On January 17, 2020, the Superior Court ruled that the Insurers could not allocate the Insureds' losses. On March 26, 2020, the Superior Court entered final judgment in favor of the Insureds.

[21] Throughout discovery and initial motion practice, five of the plaintiff insurers voluntarily dismissed their claims against Murdock, Carter, Dole, and DFC. The claims were dismissed with prejudice. Thus, as previously mentioned, RSUI remains the only Insurer involved in this litigation on appeal. The plaintiff insurers' first claim against Carter concerning coverage for the Stockholder Action was similarly dismissed with prejudice. RSUI has not appealed the Superior Court's finding as to the plaintiff insurers' second claim concerning rights to subrogation. RSUI also voluntarily dismissed its claims against DFC.

[22] Opening Br. at 7.

10

the Policy's provision governing the allocation of losses to the extent they were covered.

The Insureds raise two issues on cross appeal. First, the Insureds argue that the Superior Court erred by granting summary judgment in RSUI's favor on the Insureds' counterclaim alleging that RSUI had breached the implied covenant of good faith and fair dealing. The Insureds also contend that the Superior Court erred in determining that the findings of fraud in the Memorandum Opinion should be given collateral estoppel effect in this coverage action.

## II.

Because choice of law influences our analysis of the remaining issues, our analysis rightly begins there. Our discussion proceeds from the premise that the parties did not choose, in the Policy, the state law that is to govern their respective contractual duties.

## A.

In the Superior Court, relying heavily on *Liggett Group, Inc. v. Affiliated FM Insurance Co. ("Liggett")*[23] and hoping to avail itself of California Insurance Code Section 533's bar on insurance coverage for wilful acts,[24] RSUI contended that the proper application of the "most significant relationship" test leads to a choice of

---

[23] 788 A.2d 134, 137 (Del. Super. Ct. 2001).
[24] *See* CAL. INS. CODE § 533 (West 2021) ("An insurer is not liable for a loss caused by the wilful act of the insured . . . .").

11

California law. On appeal, RSUI makes the same argument but shifts its emphasis from *Liggett* to this Court's decisions in *Certain Underwriters at Lloyds, London v. Chemtura Corp.*[25] ("*Chemtura*") and *Travelers Indemnity Co. v. CNH Industrial America, LLC*[26] ("*CNH*"). RSUI argues that the Superior Court placed undue emphasis on Dole's status as a Delaware corporation and, consequently, created "an unprecedented and inflexible rule,"[27] under which "the insured's state of incorporation is the dispositive factor in choice of law for D&O policies."[28]

But the Insureds also say that this Court's balancing of interests in *Chemtura*, which laid emphasis on the location of the insured's headquarters at the outset of the parties' relationship, should not constrain our choice-of-law analysis in this case. The Insureds argue that the result in *Chemtura* was driven by the nature of the

---

[25] 160 A.3d 457 (Del. 2017). Although *Chemtura* was decided three months before the Insurers' opening brief and five months before their reply brief were filed in support of their summary-judgment motion in the Superior Court, neither of those briefs cites *Chemtura*. *Chemtura* was, however, cited in the Insureds' answering brief, but in support of a point different than RSUI now relies upon. And though there was a brief discussion of *Chemtura* during the oral argument on the Insurers' summary judgment motion, the Insurers' failure to cite *Chemtura* in their briefs provides a likely explanation for the Superior Court's failure to address or cite it in its opinion. But even after the Superior Court issued its opinion, when the Insurers applied to this Court for certification of an interlocutory appeal of the Superior Court's opinion—by then a year after *Chemtura* was decided—they still did not cite *Chemtura*. It was not until after we decided *CNH* in July 2018 that the Insurers cited *Chemtura* for support. In a Motion to Vacate or Revise Prior Order, filed concurrently with a motion to dismiss, the Insurers argued that *CNH*, which presented a straightforward application of *Chemtura*, "reassessed" Delaware's choice-of-law analysis in the insurance context in such a significant way that the Superior Court should reconsider the issue. App. to Opening Br. at A1452. The Superior Court properly denied that motion.
[26] 191 A.3d 288, 2018 WL 3434562 (Del. July 16, 2018) (TABLE).
[27] Opening Br. at 24.
[28] *Id.* at 27.

insurance contracts, which were part of comprehensive insurance programs governing operations around the world. D&O policies, according to the Insureds, are a different breed of cat and, as such, call for a different balancing of interests under the "most significant relationship" test than was conducted in *Chemtura*. The Insureds contend that the Superior Court struck the right balance in *Mills Ltd. Partnership v. Liberty Mutual Insurance Co.*,[29] when it found that Delaware had the most significant relationship with the risks insured by a D&O policy that insures the directors and officers of a Delaware corporation.

The Insureds also claim that, even if we were to determine that the Policy as a whole should be interpreted under California law, the Policy's definition of "Loss" contains a choice-of-law provision requiring the application of Delaware law to the determination of whether the Insureds' losses here are uninsurable.[30]

---

[29] 2010 WL 8250837 (Del. Super. Ct. Nov. 5, 2010).

[30] The definition states that matters uninsurable under the law applicable to the Policy will not be covered, provided that

> the law of the jurisdiction most favorable to the insurability of such matters shall apply; provided further such jurisdiction is: (i) where such amounts were awarded or imposed; (ii) where any **Wrongful Act** underlying the **Claim** took place; (iii) where either the Insurer or any **Insured** is incorporated, has its principal place of business or resides; or (iv) where this Policy was issued or became effective.

App. to Opening Br. at A450 (emphasis in original). Because we find that Delaware law is applicable to the interpretation of the Policy, we need not address this argument.

13

B.

The Superior Court decided choice of law on a motion for summary judgment. Choice of law is a legal question that we review *de novo*.[31]  Likewise, we review the Superior Court's grant of summary judgment *de novo*.[32]

C.

The starting point for our choice-of-law analysis in cases where the parties have not made an effective choice of law in their contract was aptly described by then-President Judge Ridgely in *Liggett*:

> Delaware has adopted the Restatement's "most significant relationship test" for determining which state's law to apply.  Choice of law questions involving insurance coverage disputes are resolved by an analysis of the contacts set forth in Restatement (Second) Conflict of Laws Section 188 and Section 193.  These contacts must also be evaluated in light of the related principles of Section 6.[33]

This Court has since embraced that analytical framework for choosing the state law that applies to comprehensive insurance programs covering risks and operations across multiple jurisdictions.  Of particular note here are our decisions in *Chemtura*[34] and *CNH*.[35]

---

[31] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1141 (Del. 1989).
[32] *Chemtura*, 160 A.3d at 464.
[33] 788 A.2d at 137 (internal footnotes omitted).
[34] 160 A.3d 457.
[35] 2018 WL 3434562.

In *Chemtura*, we noted that Section 193 "[t]he *Second Restatement* provides a presumption for insurance contracts[] that, as a general matter, the law of the state 'which the parties understood was to be the principal location of the insured risk' should be applied because that state will have the most significant relationship."[36] But we also recognized that, if the facts of a case don't fit the *Second Restatement*'s presumptions—such as when the insurance contract is part of a comprehensive program insuring risks that are not confined to a single jurisdiction—we must look at "broader subject-matter-specific factors"[37] that bear on the significance of the different states' relationship to the contract.

To perform this next level of analysis, we turn to Section 188 of the *Second Restatement*, which addresses contract disputes more broadly. The contacts to be taken into account at this step are: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and place of business of the parties.[38] And as we observed in *Chemtura* and *CNH*, we weigh the relative importance of these contacts in light of the overarching choice-of-law considerations set forth in Section 6 of the *Second Restatement*. They are:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,

---

[36] *Chemtura*, 160 A.3d at 465.
[37] *Id.*
[38] Restatement (Second) of Conflict of Laws § 188.

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.[39]

Both sides agree that the choice-of-law analysis in this case should track the framework outlined above, and by and large the Superior Court did just that.[40] But as the Restatement drafters frankly admit, the "most significant relationship" test, while providing "some clue to the correct approach, . . . does not furnish precise answers."[41] So it is not surprising that the parties, applying the same test, would come up with different answers, each urging the trial court—and now us—to choose the state law that it believes will view its legal positions more favorably. Our job, as it was in *Chemtura* and *CNH*, is to balance the factors in a manner that will best accommodate the conflicting values represented in the test that both sides agree is applicable. To get this job done, we first review how the parties would have us balance the relevant factors.

---

[39] Restatement (Second) of Conflict of Laws § 6.

[40] The Superior Court did not refer specifically to Section 193's emphasis on "the principal location of the insured risk," but, quoting the comments to Section 188, it did recognize that "[t]he state where the thing or risk is located will have a natural interest in transactions affecting it." *Arch Ins. Co. v. Murdock*, 2018 WL 1129110, at *9 (Del. Super. Ct. Mar. 1, 2018).

[41] Restatement (Second) of Conflict of Laws § 6 cmt. c.

16

D.

In support of its claim that "[t]he undisputed facts all point to the application of California law,"[42] RSUI emphasizes the Policy's broad coverage of claims made against the Insureds anywhere in the world that may or may not arise under Delaware law.[43] RSUI further notes the fact that the negotiation and procurement of the policies occurred at Dole's headquarters in Westlake Village, California through a California-based insurance broker and that the policies were ultimately issued to that broker in its Los Angeles office and then delivered to Dole's headquarters. RSUI also observes that AXIS, Dole's primary insurer, managed Dole's account from its west coast regional office and that the Policy contains California amendatory endorsements. RSUI also points out that Dole's "directors and officers lived and worked in California at the Company's headquarters."[44] RSUI contends that "[t]he single fact of Dole's incorporation in Delaware—which is largely irrelevant to where

---

[42] Opening Br. at 21.

[43] RSUI asserts that, particularly with respect to securities claims that are subject to federal law, "the coverage grant of the . . . Policy is much more expansive than claims that might only be raised in Delaware under Delaware law." *Id.* at 26. In oral argument before this Court, RSUI argued that the Policy would cover claims such as state and federal securities claims, intellectual property and trade secrets claims, antitrust claims, negligent hiring and supervision claims, and claims brought under the Foreign Corrupt Practices Act among others. But as RSUI observes, "the facts relating to underlying claims are irrelevant to the choice of law analysis." *Id.* at 23 (citing *CNH*, 2018 WL 3434562, at *5–7). The relevant inquiry in a choice-of-law analysis for a D&O policy is not driven by the type of underlying claim or the facts surrounding it. Rather, as we hold here, a choice-of-law analysis for a D&O policy will most often reveal that the insured's state of incorporation has the most significant relationship to the D&O policy.

[44] *Id.* at 27.

the insurance contracts were actually formed—does not remotely override the remaining facts."[45]

For their part, the Insureds argue that the Superior Court correctly determined that Delaware had the most significant relationship to this case. The Insureds reason that "Delaware has a substantial interest in its law being applied to interpret D&O policies of Delaware corporations,"[46] because under 8 *Del. C.* § 145(g), Delaware law permits its Delaware corporations to purchase insurance to protect its directors and officers against any liabilities whether or not the corporation has the power to indemnify the director or office for such liability. Further, the Insureds assert that "applying Delaware law would lead to certainty, predictability, and uniformity of result."[47]

Adhering closely to its analysis in *Mills*, the Superior Court agreed with the Insureds that Delaware, and not California, had the more significant interest in the subject matter of the Policy; it therefore applied Delaware law. We agree with this conclusion.

E.

RSUI's criticism of the Superior Court's reliance on the court's reasoning in *Mills* is, in our view, misguided. For instance, RSUI argues that the Superior Court

---

[45] *Id.* at 21.
[46] Answering Br. at 24.
[47] *Id.* at 25.

18

was wrong to rely on *Mills* because its choice-of-law analysis was merely dicta.[48] But the Superior Court did not say that it was bound to follow *Mills*, only that it thought it was "better authority for this situation"[49] than *Liggett*, the authority RSUI most steadfastly relied upon in support of its motion for summary judgment on choice of law. In like manner, RSUI claims that "[t]he Superior Court . . . suggested that *Chemtura* and *CNH* are limited solely to 'general comprehensive liability' policies."[50] Having reviewed the comment at oral argument on RSUI's summary judgment upon which RSUI bases this claim, we believe that it is an unfair characterization of the Superior Court's remark, especially when we consider that the Insurers had not cited *Chemtura* in its briefs.[51] Rather, we understand the Superior Court to have recognized that its choice-of-law analysis should be faithful to *Chemtura*'s framework, but nevertheless to have reached a different result after balancing the *Second Restatement* factors.[52]

This last point highlights what we see as the fundamental flaw in RSUI's argument—it presents a false dichotomy. Both *Chemtura* and *Mills* adhere to the same analytical framework. For RSUI, however, because *Mills* weighed the relevant

---

[48] Opening Br. at 25.

[49] *Arch Ins. Co.*, 2018 WL 1129110, at *10.

[50] Opening Br. at 25.

[51] *See supra* note 25.

[52] In the transcript page that follows the page RSUI cites on this point, the trial judge remarked: "I analyzed it exactly how the Court said I was supposed to . . . in *Chemtura* . . . . [T]he only question is[:] did I make a mistake on the facts[?]" Opening Br. Ex. C at 20.

factors differently than *Chemtura* did, it is inconsistent with, and must yield to, *Chemtura* as a precedent of this Court. We disagree with this "either/or" conclusion.

In our view, the question is whether the Superior Court's application of the choice-of-law rules that all seem to agree are applicable—rules that the Superior Court has followed for years and upon which we placed our seal of approval in *Chemtura*—was erroneous as a matter of law. In answering that question, we must determine whether the court's analysis runs afoul of *Chemtura*. Put another way, we ask whether *Chemtura* dictates that the balancing of the *Second Restatement* factors must be conducted uniformly for all insurance policies without regard to their subject matter and animating purpose. Our answer is that it does not; *Chemtura* itself allows that the application of its framework can, on different facts, lead to different results.

Contrary to what RSUI contends, *Chemtura* does not dictate that California law applies to the interpretation of the Policy. RSUI's contention ignores the dynamic underlying the choice-of-law problem we confronted in *Chemtura*, which was "the need for comprehensive insurance programs to have a single interpretive approach using a single body of law."[53] In *Chemtura,* the trial court's decision, which held that "the insurance policy was not to be interpreted under a consistently applied law but under the contract law of the different states where [environmental]

---

[53] *Chemtura*, 160 A.3d at 460.

20

claims arose on a claim-by-claim basis,"[54] frustrated that goal. Ultimately, we recognized that "the proper inquiry under the *Second Restatement* should be to make a reasoned determination of what state has the most significant interest in applying its law to the interpretation of the insurance scheme and its terms as a whole in a consistent and durable manner that the parties can rely on."[55]

Because the policies covering the environmental claims in *Chemtura* were part of a comprehensive insurance program addressing risks across corporate operations in multiple jurisdictions, the selection of a single interpretive approach, i.e., one state, as opposed to many, whose law would apply with regard to where a claim arose, would best serve the parties' expectations. This prompted us to give additional weight to the insured's principal place of business and the center of its insurance activities when we balanced the *Second Restatement* factors. But we were quick to acknowledge that "the facts of a particular case might lead to a different outcome."[56] We think that this is just such a case and that the Superior Court's application of the *Second Restatement* test in *Mills* and in this case was correct.[57]

---

[54] *Id.* at 459.

[55] *Id.* at 460.

[56] *Id.*

[57] The footnote in *Homeland Insurance Co. v. CorVel Corp.* upon which RSUI relies does not compel a different result. In that case, the parties argued over the choice of law for CorVel's bad-faith claim, with CorVel arguing for the application of Louisiana law and Homeland contending for Delaware. Although we observed that it was possible "that neither party [was] correct, given the centrality of California to the nationwide insurance relationship set up between CorVel, as a California based business, and Homeland, an insurer incorporated in New York with its principal

F.

The crux of the *Mills* choice-of-law analysis—whether it represents its holding or is dicta is of no moment to us—is that "[w]hen the insured risk is the directors' and officers' 'honesty and fidelity' to the corporation"—and we would add to its stockholders and investors—"and the choice of law is between headquarters or the state of incorporation, the state of incorporation has the most significant interest."[58] This conclusion is consistent with the "three material framing points" that influenced our analysis in *Chemtura* and, in particular, our guidance that we must examine the insurance contract as a whole to determine its subject matter.

The subject matter of the Policy, as its title announces, is "Directors, Officers and Corporate Liability."[59] The policy holder is Dole, a Delaware corporation at the relevant time, and the individuals the Policy insures are Dole's duly elected or appointed directors and officers. And the Insurers' obligation to pay a loss incurred by a director or officer only extends to "wrongful act[s]," which, in the context of this case, means "any actual or alleged error, misstatement, misleading statement,

---

place of business in Massachusetts," we went no further than to recognize that the questions, the answer to which was irrelevant to our decision, presented a "litigable issue." *Homeland Ins. Co.*, 197 A.3d 1042, 1046 n.13 (Del. 2018). And, for the purpose of our decision, we assumed that CorVel's position was correct. This is hardly a ringing endorsement of RSUI's position here— that "the principles of *Chemtura* and *CNH* apply to errors and omissions policies, . . . which are not general liability policies and in fact are more similar to D&O insurance." Opening Br. at 25. Much less does *CorVel* support the conclusion that the application of "the principles of *Chemtura* and *CNH*" will necessarily result in the choice of California law in this case.

[58] *Mills*, 2010 WL 8250837, at *6.

[59] App. to Opening Br. at A429.

22

act, omission, neglect, or breach of duty by . . . [the director or officer] *in their capacity as such . . . ."*[60]

Delaware has specific policies that affect this subject matter as expressed in 8 *Del. C.* § 145. Indeed, it is by virtue of this statute, which permits Delaware corporations to provide broad indemnification and advancement rights to their directors and officers and to purchase D&O policies to protect them even where indemnification is unavailable, that Dole was authorized to purchase the Policy. The enactment of Section 145 is evidence of Delaware's recognition that minimizing the downside risks of serving as a director or officer through D&O insurance will enhance the ability of Delaware corporations to attract talented people to fill those roles.[61] And as recently noted in *Calamos Asset Management, Inc. v. Travelers Casualty & Surety Co. of America* ("*Calamos*") "[b]ecause Delaware law governs the scope and entitlement to indemnification and advancement, applying Delaware

---

[60] *Id*. at A436 (emphasis added).
[61] *See* Christopher French, *The Insurability of Claims for Restitution*, 18 U. Pa. J. Bus. L. 599, 614–15 (2016) ("The most common explanation for why D&O insurance is allowed and considered desirable is that companies would not be able to attract talented people to run companies if corporate managers had to risk their own personal assets in order to do so. For similar reasons, many states, including Delaware where over 50% of all publicly traded corporations and over 63% of the Fortune 500 are incorporated, have passed statutes that allow companies to indemnify corporate managers for many types of misconduct and to purchase insurance to cover the losses they are allowed to indemnify as well as the ones they are unable to indemnify.") (internal footnotes omitted).

law to the D&O policies that actually cover those costs advances the relevant policies of the forum."[62]

It is also the case—as observed in *Mills* and *Calamos*—that, in the vast majority of cases, Delaware law governs the duties of the directors and officers of Delaware corporation to the corporation, its stockholders, and its investors.[63] As such, corporations must assess their need for D&O coverage with reference to Delaware law.

These factors suggest that the state of incorporation is the center of gravity of the typical D&O policy, including the Policy under consideration here. But that does not end our analysis. We must yet consider whether the California contacts in this particular instance are sufficient to tip the balance toward California. On this point, RSUI stresses that Dole's headquarters is in Westlake Village, California, where Dole's directors and officers also live and work. But this emphasis on physical location underrates the significance of Dole's status as a Delaware corporation—an entity formed and existing by virtue of the Delaware Constitution[64] and the Delaware

---

[62] *Calamos*, 2020 WL 3470473, at *3 (D. Del. June 25, 2020).

[63] *Id.* at *4; *Mills*, 2010 WL 8250837, at *6.

[64] *See* Del. Const. art. IX, § 1 ("No corporation shall hereafter be created, amended, renewed or revived by special act, but only by or under general law, nor shall any existing corporate charter be amended, renewed or revived by special act, but only by or under general law . . . . The General Assembly shall, by general law, provide for the revocation or forfeiture of the charters of all corporations for the abuse, misuse, or non-user of their corporate powers, privileges or franchises. Any proceeding for such revocation or forfeiture, shall be taken by the Attorney-General, as may be provided by law.").

General Corporation Law.[65]  As such, Dole is every bit a "citizen" of Delaware as it is of California.[66]  And its directors and officers, to the extent they are acting "in their capacity as such" and are therefore covered by the Policy, act on behalf of Dole as a corporate entity, whose legal residence is in Delaware.  Seen from this vantage point, the Insureds' legal ties to Delaware are more significant—and therefore should be afforded greater weight—than their physical location in California.

Nor do we find the other previously discussed California contacts to be as legally significant or as laden with policy considerations as Dole's status as a Delaware corporation and the individual insureds' status as directors and officers, all operating under the authority and guidance of Delaware law.  To be clear, we do not ignore the California contacts and acknowledge that they might be dispositive were we addressing an insurance policy covering a different subject matter and insureds with a more tenuous connection to Delaware than a Delaware corporation and its directors and officers have.  Yet when we balance the California contacts against Delaware's interest in protecting the ability of its considerable corporate

---

[65] 8 *Del. C.* § 101 *et seq.*

[66] References in our case law to Delaware corporations as "citizens" of our State are legion.  *See, e.g.*, *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 896 (Del. 1994) ("WSI is a corporate citizen and taxpayer of the State of Delaware . . . ."); *Asten v. Wangner*, 1997 WL 634330, at *3 (Del. Ch. Oct. 3, 1997) ("Delaware is often called upon to apply the law of other states at the request of its corporate citizens . . . ."); *Dippold-Harmon Enters., Inc. v. Lowe's Cos., Inc.*, 2001 WL 1414868, at *4 (D. Del. Nov. 13, 2001) ("Delaware has an interest in this action. [The plaintiff] is a Delaware corporation.  Clearly this forum's interests extend to corporate citizens that have sought the protection of Delaware's laws.").

citizenry to secure D&O insurance and thereby attract talented directors and officers, and for the other reasons mentioned above, we find that Delaware has the most significant relationship to the Policy and the parties. We therefore affirm the Superior Court's choice-of-law decision and proceed with our analysis accordingly.

## III.

Having determined that Delaware law applies to our interpretation of the Policy, we now turn to RSUI's contention that the public policy of Delaware vitiates coverage of the Insureds' losses. According to RSUI, because the settlements in the Stockholder Action and San Antonio Action were predicated on the Court of Chancery's findings of fraud on Murdock's and Carter's part, Delaware's public policy should bar their insurability. "Fraud," RSUI argues, "should be uninsurable in Delaware."[67] The Superior Court disagreed, holding that Delaware public policy does not prohibit Delaware corporations from securing D&O insurance that covers breach of loyalty claims based on fraud.

## A.

We review questions that turn on public-policy grounds *de novo*.[68]

---

[67] Opening Br. at 37.
[68] *Jones v. State Farm Mut. Auto. Ins. Co.,* 610 A.2d 1352, 1353 (Del. 1992).

B.

RSUI argues that allowing the Insureds a recovery under the Policy would undermine the Court of Chancery's disgorgement remedy and, more generally, that, as a matter of public policy, "insurance should not be available for intentional wrongdoing,"[69] citing our recent opinion in *USAA Casualty Insurance Co. v. Carr*[70] ("*Carr*"). Both of these arguments are extra-contractual; that is, unlike RSUI's contention that coverage is excluded under the Policy's Profit/Fraud Exclusion, which we will address later, RSUI assumes coverage but asks us to void it because it contravenes public policy. We reject this invitation to void the Insureds' otherwise valid coverage.

C.

We start our analysis by reaffirming our respect for the right of sophisticated parties to enter into insurance contracts as they deem fit "in the absence of clear indicia that . . . [a countervailing public] policy exists."[71] As described earlier, the Policy has an expansive definition of covered losses, which on its face does not exclude losses occasioned by fraud. Among other things, the Insurers agreed to "pay on behalf of the **Insured Individual** all **Loss** . . . arising from any **Claim** for a

---

[69] Opening Br. at 39.
[70] 225 A.3d 357 (Del. 2020).
[71] *Whalen v. On-Deck, Inc.*, 514 A.2d 1072, 1074 (Del. 1986) (holding that "public policy in this State does not prohibit the issuance of an insurance contract that covers punitive damages").

**Wrongful Act** first made against . . . such **Insured Individual** . . . [and] pay on behalf of the **Policyholder** all **Loss** arising from any **Securities Claim** first made against the **Policyholder** for a **Wrongful Act**."[72]  "**Wrongful Act**" is defined to include "actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty."[73]  And "**Loss** means all monetary amounts which the **Insureds** become legally obligated to pay on account of a **Claim**, including damages, settlement amounts and judgments, including any award of punitive, exemplary or multiple damages, pre-judgment or post-judgment interest, costs and fees pursuant to judgments, [and] **Defense Costs**."[74]  Allegations of fraud fit comfortably within these terms defining the scope of coverage.  Indeed, the Policy's exclusion of losses "based upon, arising out of or attributable to . . . any deliberately . . . fraudulent act," but only if "established by a final and non-appealable adjudication,"[75] implies that fraud  that does not fall within the exclusion because it has not been finally adjudicated will otherwise be covered.  Thus, leaving the

---

[72] App. to Opening Br. at A447–48 (emphasis in original).
[73] *Id.* at A432 (emphasis in original).
[74] *Id.* at A449 (emphasis in original).
[75] *Id.* at A453.

applicability of the Profit/Fraud Exclusion aside for the moment, RSUI's public-policy argument, if accepted, would defeat the parties' contractual expectations.

As we have previously recognized,

> [w]hen parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntary-undertaken mutual obligations.[76]

The question here then is: does our State have a public policy against the insurability of losses occasioned by fraud so strong as to vitiate the parties' freedom of contract? We hold that it does not. To the contrary, when the Delaware General Assembly enacted Section 145 authorizing corporations to afford their directors and officers broad indemnification and advancement rights and to purchase D&O insurance "against *any* liability" asserted against their directors and officers "whether or not the corporation would have the power to indemnify such person against such liability under this section,"[77] it expressed the opposite of the policy RSUI asks us to adopt.

---

[76] *ev3, Inc. v. Lesh,* 103 A.3d 179, 2014 WL 4914905, at *2 n.3 (quoting then-Vice Chancellor Strine in *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006)).

[77] 8 *Del. C.* § 145(g).

This conclusion is inherent in the limitation, found in Section 145(a), on a corporation's authority to indemnify its directors and officers for expenses incurred if the person, in his underlying conduct, "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation . . . ."[78] Implicit in this limitation, when read together with Section 145(g)'s authorization to secure insurance against liabilities for which the corporation does not have the power to indemnify, is the corporation's statutory authority to obtain D&O insurance for liabilities arising from bad-faith conduct.[79]

Nor is our conclusion inconsistent, as RSUI suggests, with our dicta in *Carr*. There, quoting *Hudson v. State Farm Mutual Insurance Co.*,[80] we referred to "the 'well established common law principle that an insured should not be allowed to

---

[78] *Id.* § 145(a).

[79] We note that one of the drafters of Section 145 made remarks at a Delaware Corporation Law symposium in 1977 that could be read as conflicting with our interpretation of the statute. *See* S. Samuel Arsht, *Indemnification Under Section 145 of the Delaware General Corporation Law*, 3 Del. J. Corp. L. 159, 179–80 (1978). Yet we stand by our reading of the language of the statute and believe that, to the extent that D&O carriers believe that public policy considerations are relevant to their coverage, they should write them into their policies—as the insurers did here. *See* E. Norman Veasey, Jesse A. Finkelstein & C. Stephen Bigler, *Delaware Supports Directors with a Three-Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 418 (1987) ("While the language of section 145(g) contains no explicit limitations on the scope of matters that may be insured against under that subsection, its drafters specifically intended that the available insurance would be limited by public policy considerations *written into D&O policies by insurers*.") (emphasis added). *See also* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 4:13[A] (3d ed. 1998) ("Although underwriters generally refuse to insure for, or are statutorily precluded from insuring for, intentional wrongs or underwriting criminal wrongs, D&O insurance coverage for amounts paid in settlement of a claim alleging such wrongs seems to be allowable.") (footnote omitted).

[80] 569 A.2d 1168 (Del. 1990).

profit, by way of indemnity, from the consequences of his own wrong doing,' in a context where no announced public policy applies."[81]  But here, as noted above, our public policy—to the extent it is "announced" in Section 145—weighs in favor of the insurability of losses incurred as the result of a breach of the duty of loyalty, including one marred by fraud.

Other considerations support our conclusion.  For instance, in the high-stakes arena of stockholder litigation, a blanket prohibition, on public-policy grounds, against insuring for losses arising from a director's or officer's misstatements, misleading statements, or breaches of the duty of loyalty (when based on fraud) would leave many injured parties without a means of recovery.  This conflicts with the public policy that favors the compensation of innocent victims.

Our conclusion gains further support from this Court's decision in *Whalen v. On-Deck, Inc.*[82]  In that case, the Superior Court had granted summary judgment in favor of a liability insurance carrier, holding, on public-policy grounds, that it was not obligated to pay punitive damages assessed against its insured.  In so holding, the Superior Court found that

> a rule prohibiting the issuance of insurance covering punitive damages
> more accurately reflects the public policy of this State.  It would be
> unjust and contrary to reason to assess punitive damages against [the
> insurer] when it has done no wrong, and the punitive and deterrent
> purposes underlying punitive damages would be frustrated if one who

---

[81] *Carr*, 225 A.3d at 362 (quoting *Hudson*, 569 A.2d at 1170).
[82] 514 A.2d 1072.

31

has acted wantonly were permitted to shift the burden to its insurer, and ultimately to the public.[83]

This Court reversed the Superior Court, pointing to the Delaware legislature's primacy in establishing this State's policy and the importance of the parties' freedom of contract:

> [T]here is no evidence of public policy in this State against such insurance. The Delaware Legislature has formulated no such policy, and this Court has indicated in the past that it would defer to the Legislature on the issue. While the Superior Court and [the insurer] believe the purposes of punitive damages would be frustrated if such damages were insurable, we cannot infer from that concern a policy against such insurance. A wrongdoer who is insured against punitive damages may still be punished through higher insurance premiums or the loss of insurance altogether. More importantly, in light of the importance of the right of parties to contract as they wish, we will not partially void what might otherwise be a valid insurance contract as contrary to public policy in the absence of clear indicia that such a policy actually exists.[84]

We think that *Whalen*'s approach—deferring to the parties' contractual choices and to the legislature's prerogative in matters of public policy—is a wise one. We show this deference not because we condone fraud in Delaware; in fact, we have an unwavering policy against it.[85] But concluding that certain conduct, including a director's breach of loyalty sounding in fraud, is not uninsurable on

---

[83] *Whalen v. On-Deck, Inc.*, 1986 WL 2838, at *3 (Del. Super. Ct. Jan. 10, 1986).

[84] *Whalen*, 514 A.2d at 1074.

[85] *See, e.g.*, *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 137 (Del. Ch. 2009) (noting "Delaware's strong policy against intentional fraud"); *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1035 (Del. Ch. 2006) ("The public policy against fraud is a strong and venerable one that is largely founded on the societal consensus that lying is wrong.").

public-policy grounds is notably different than placing a stamp of approval on that conduct. Hence, in the absence of clear guidance from the General Assembly to the contrary, we must reject RSUI's invitation to void its contractual obligations on public-policy grounds. We therefore turn to RSUI's contract-based arguments.

IV.

A.

RSUI next argues that, even if coverage is not defeated on public-policy grounds, the Policy's Profit/Fraud Exclusion precludes insurance coverage for the Insureds' actions. To reiterate, that exclusion provides that:

> The Insurer shall not be liable for **Loss** on account of any **Claim**:
> . . .
> . . . based upon, arising out of or attributable to:
> > . . . any profit, remuneration or financial advantage to which the **Insured** was not legally entitled; or
> > . . . any willful violation of any statute or regulation or any deliberately criminal or fraudulent act, error or omission by the **Insured**;
> if established by a final and non-appealable adjudication adverse to such **Insured** in the underlying action.[86]

As RSUI points out, "[a]t issue before the Superior Court was whether [the Memorandum Opinion] . . . meets the Exclusion's requirement of a 'final and non-appealable adjudication;'"[87] the Superior Court found that it did not and that, therefore, the Profit/Fraud Exclusion did not apply.

---

[86] App. to Opening Br. at A453 (emphasis in original).
[87] Opening Br. at 42.

B.

"The interpretation of an insurance policy is a question of law and subject to *de novo* review."[88]  A brief survey of the principles that guide our review is appropriate here.

"Insurance contracts, like all contracts, 'are construed as a whole, to give effect to the intentions of the parties.'"[89]  Proper interpretation of an insurance contract will not render any provision "illusory or meaningless."[90]  If the contract language is "clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[91]  Where the language is ambiguous, the contract is to "be construed most strongly against the insurance company that drafted it."[92]  A contract is not ambiguous simply because the parties do not agree on the proper construction.[93]  "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[94]

---

[88] *Carr*, 225 A.3d at 360.

[89] *AT & T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del. 2007) (quoting *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996)).

[90] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001).

[91] *Faraday Capital Ltd.*, 918 A.2d at 1108 (quoting *Esmark, Inc.*, 672 A.2d at 43).

[92] *O'Brien*, 785 A.2d at 288 (citing *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) and *Steigler v. Ins. Co. N. Am.*, 384 A.2d 398, 400 (Del. Super. Ct. 1978)).

[93] *Rhone-Poulenc*, 616 A.2d at 1196.

[94] *Id.*

Insurance contracts should be interpreted as providing broad coverage to align with the insured's reasonable expectations.[95] "Generally, an insured's burden is to establish that a claim falls within the basic scope of coverage, while an insurer's burden is to establish that a claim is specifically excluded."[96] Courts will interpret exclusionary clauses with "a strict and narrow construction . . . [and] give effect to such exclusionary language [only] where it is found to be 'specific,' 'clear,' 'plain,' conspicuous,' and 'not contrary to public policy.'"[97]

## C.

The Superior Court's ruling on the applicability of the Profit/Fraud Exclusion pre-dated the San Antonio Action settlement.[98] Therefore, the court focused its analysis on the Memorandum Opinion, and, as such, its decision did not mention the San Antonio Action. RSUI's briefing in this Court adopts a similar approach, attending almost exclusively to whether the Memorandum Opinion in the Stockholder Action is a "final and non-appealable adjudication." But if Dole's settlement of the San Antonio Action is not subject to the Profit/Fraud Exclusion, then the exclusion's effect on the Stockholder Action settlement matters little; if

---

[95] *AT & T Corp. v. Clarendon Am. Ins. Co.*, 2006 WL 1382268, at *9 (Del. Super. Ct. Apr. 13, 2006), *rev'd in part on other grounds*, *Faraday Capital Ltd.*, 918 A.2d 1108.
[96] *Id.*
[97] *Id.*
[98] This ruling in found in the court's December 21, 2016 opinion, granting in part and denying in part the Insureds' Rule 12(b)(6) motion to dismiss. The San Antonio Action settlement was not approved by the federal district court until July 18, 2017.

RSUI is on the hook for the San Antonio Action settlement, that alone will exhaust its coverage limits rendering consideration of the Profit/Fraud Exclusion's application to the Stockholder Action moot. We therefore address the San Antonio Action settlement first.

RSUI's sole reference in its opening brief to the San Antonio Action settlement as it relates to this issue is alarmingly brief:

> As for *San Antonio*, the allegations arose directly out of the findings contained in the [Memorandum Opinion]. Thus, the settlement is "based upon, aris[es] out of, or attributable to" the adjudication of fraud in the *Stockholder* Action, meaning the Profit/Fraud Exclusion applied equally to both *Stockholder* and *San Antonio*.[99]

Thus, RSUI contends that the relationship between the allegations of fraud in the San Antonio Action and the Court of Chancery's findings in the Stockholder Action triggers the Profit/Fraud Exclusion. This, in our view, is contrary to the exclusion's requirement that the adjudication of fraud must be "in the underlying action."

RSUI seems to admit that there was no adjudication in the San Antonio Action, but pronounces that "[t]he phrase 'in the underlying action' was clearly not intended to limit the Exclusion's application to follow-on collateral estoppel litigation for the same conduct."[100] We are not convinced by this argument.

---

[99] Opening Br. at 48.
[100] Reply Br. at 39.

Contrariwise, we interpret "the underlying litigation" in the settlement context to mean the litigation in connection with which the Insureds became legally obligated to pay on account of a claim.[101]  According to the Policy, a "**Claim**" means "a civil . . . proceeding against any **Insured** commenced by . . . the service of a complaint or similar pleading."[102]  The record establishes that the claims in the San Antonio Action took the form of an Amended Class Action Complaint alleging federal securities fraud claims, filed on June 23, 2016 in the United States District Court for the District of Delaware as distinguished from the claims that were made in the Stockholder Action.

That some findings in the Memorandum Opinion might have been implicated in the resolution of the San Antonio Action had it not been settled is irrelevant to a determination of whether there was an adjudication in the San Antonio Action; holding otherwise would ignore the plain meaning of the Profit/Fraud Exclusion's stipulation that only "fraudulent act[s] . . . established by a final and non-appealable adjudication adverse to [the] Insured in the underlying action" would be subject to the exclusion.  And even if we were to grant that the meaning of "the underlying litigation" could be interpreted to include the San Antonio Action—and we don't—

---

[101] Under Section III.I, "**Loss**" is defined as "all monetary amounts which the **Insureds** become legally obligated to pay on account of a **Claim**, including damages, settlement amounts and judgments, including any award of punitive, exemplary or multiple damages, pre-judgment or post-judgment interest, costs and fees awarded pursuant to judgments, [and] **Defense Costs**." App. to Opening Br. at A449 (emphasis in original).
[102] *Id.* at A432 (emphasis in original).

that would not render the Insureds' interpretation unreasonable. Instead, it would merely be to recognize an ambiguity. And under our insurance law jurisprudence, we would construe that ambiguity in favor of the Insureds.[103] Either way, as applied to Dole's loss in the San Antonio Action, the Profit/Fraud Exclusion fails.

D.

As suggested earlier, the practical consequence of our conclusion that the Profit/Fraud Exclusion fails as to Dole's loss attributable to the San Antonio Action is significant. In defending the Stockholder Action, AXIS, Dole's primary insurer, reached its $15 million limits. Shortly thereafter, Dole's second layer of insurance was also exhausted after reaching its $10 million limits in also defending the Stockholder Action. Dole's third layer of insurance was exhausted in part on defense costs associated with the Stockholder Action and in part on the San Antonio Action settlement. After that contribution to the San Antonio Action settlement, Dole paid the remaining approximately $66 million settlement amount. The record is unclear as to when the remaining layers of Dole's coverage were exhausted. But we know that all other Insurers have either paid their limits or settled with Dole. In any event,

---

[103] *Rhone-Poulenc*, 616 A.2d at 1196 (citing *Steigler*, 384 A.2d at 400).

the $66 million settlement paid by Dole is more than enough to reach and exhaust RSUI's $10 million limits.[104]

## V.

## A.

In its amended complaint for declaratory relief, RSUI alleged that "[t]o the extent that the Court determines that any portion of the *Stockholder Settlement* or **Defense Costs** in connection with the *Stockholder Action* is covered, any amounts to be paid must be allocated to covered **Loss** pursuant to the terms of the Policies."[105] According to RSUI, Section VIII.A of the Policy should govern that allocation. Under that provision,

> [i]f in any **Claim**, the **Insureds** who are afforded coverage for such **Claim** incur **Loss** jointly with others (including other **Insureds**) who are not afforded coverage for such **Claim**, or incur an amount consisting of both **Loss** covered by this Policy and loss not covered by this Policy because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of covered **Loss**. The Insurer's obligation shall relate only to those sums allocated to matters and **Insureds** which are afforded coverage. In making such determination, *the parties shall take into account the relative legal and financial exposures of the **Insureds** in connection with the defense and/or settlement of the **Claim***.[106]

---

[104] At oral argument in this Court, when asked about this, RSUI's counsel did not contest the contention that, if we found that the San Antonio Action settlement was covered, then RSUI's coverage would be exhausted. Instead, counsel argued that the Profit/Fraud Exclusion should defeat coverage of the San Antonio Action settlement.

[105] App. to Opening Br. at A381–82 (emphasis in original).

[106] *Id.* at A440–41 (bold type in original) (italics added).

Here, RSUI argues that, to give meaning to the plain language of Section VIII.A, the Superior Court should have conducted a "relative exposure" analysis, weighing the relative exposures between covered and non-covered losses. Instead, the Superior Court applied the "larger settlement rule," under which, broadly speaking, a loss is fully recoverable unless the insurer can show that the liability for non-covered conduct increased the insurer's liability. Under a "relative exposure" analysis, RSUI contends that its excess insurance layer would not be reached because "significant liability was placed on non-insured DFC, and liability was incurred for actions taken in uninsured capacities (Murdock as a controlling shareholder and Carter as General Counsel)."[107]

## B.

Because the resolution of this issue turns on the interpretation of the Policy, our review is *de novo*.[108]

## C.

In its January 17, 2020 Memorandum Opinion on Allocation, the Superior Court rejected RSUI's invitation to allocate the Insureds' losses with reference to "the relative legal and financial exposures of the Insureds" on various grounds. Noting that the factual record would not support a finding that either RSUI or the

---

[107] Opening Br. at 52–53.
[108] *Carr*, 225 A.3d at 360.

40

Insureds requested a pre-suit allocation under Section VIII.A or that one was requested by one party but the other failed to use its best efforts, the court found "the Allocation Provision . . . mostly unhelpful under the facts presented here."[109]

Section VIII.A was unhelpful in the Superior Court's eyes because, for example, it does not establish an allocation methodology to be applied in the absence of an agreement between the parties. Moreover, limiting RSUI's responsibility for the Insureds' losses in the manner favored by RSUI ignores other, more substantive, policy language. The Court observed that it was

> to interpret the insurance policy through a reading of all the relevant provisions of the contract as a whole, and not any single passage in isolation. The Policies cover all Loss that the Insured(s) become legally obligated to pay. Such language implies . . . a complete indemnity for Loss regardless of who else might be at fault for similar actions. The Policies do not limit coverage because of the activities of others that might overlap the claims against the Insureds. Any type *of pro rata* or relative exposure analysis seems contrary to the language of the Policies.[110]

We agree with both of these observations and the Superior Court's resulting conclusion that the "larger settlement rule" captures the extent to which RSUI's indemnity obligations might be reduced by an allocation of a portion of the Stockholder Action settlement to non-covered losses or uninsured parties. Under the rule, as articulated by the Ninth Circuit Court of Appeals in *Nordstrom, Inc. v.*

---

[109] *Arch Ins. Co. v. Murdock*, 2020 WL 1865752, at *6 (Del. Super. Ct. Jan. 17, 2020).

[110] *Id.* at *7 (emphasis in original) (internal quotations and citations omitted).

*Chubb & Son, Inc.*, "responsibility for any portion of a settlement should be allocated away from the insured party *only if the acts of the uninsured party are determined to have increased the settlement*."[111]

Here, RSUI has not argued that the acts of DFC or the actions of Murdock and Carter in their uninsured capacities increased the amount of the Stockholder Action settlement. Indeed, since DFC was found to be liable as an aider and abettor "to the same extent as"[112] Murdock, it would appear as though DFC's actions could not have increased the Stockholder Action settlement. And, aside from conclusory assertions, RSUI has pleaded no facts that suggest the San Antonio Action settlement represented an admixture of covered and non-covered losses.[113] Nor, for that matter, has RSUI ventured an explanation of how the application of their "relative exposure" allocation theory would lead to a reduction in the coverage available to the Insureds. We therefore affirm the Superior Court's Memorandum Opinion on Allocation.

---

[111] *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1432 (9th Cir. 1995) (emphasis in original) (citing *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 358 (7th Cir. 1990) and *Caterpillar Inc. v. Great Am. Ins. Co.*, 864 F. Supp. 849, 853 (C.D. Ill. 1994)).

[112] *In re Dole*, 2015 WL 5052214, at *39.

[113] In its Brief in Opposition to Defendants' Motions for Summary Judgment, RSUI asserted that "the Settlements included non-covered "loss" and amounts paid on behalf of non-insureds." App. to Opening Br. at A2375. But RSUI's briefing challenges the reasonableness of the San Antonio settlement and whether the Stockholder Action settlement and San Antonio Action settlement constitute a "Loss," to the exclusion of explaining what portion of the San Antonio Action settlement are attributable to a non-covered loss. Similarly, in its briefing in this Court, RSUI focuses on the allocation of the Stockholder Action settlement, again to the exclusion of explaining allocation of the San Antonio Action settlement.

VI.

The Insureds raise two issues on cross appeal. First, they argue that the Superior Court erred by granting summary judgment in favor of RSUI on the Insureds' claims for breach of the implied covenant of good faith and fair dealing. Second, the Insureds contend that the trial court erred in finding that collateral estoppel applies to the Insureds as to factual issues litigated and decided in the Memorandum Opinion. For the reasons discussed below, we conclude that the Insureds' implied-covenant argument on cross appeal is without merit. Because the Insureds' collateral-estoppel argument is relevant only "to the extent this Court reverses any of the Superior Court's rulings,"[114] and we have not done so, we will not address that argument.

A.

As we have stated above, this Court reviews the Superior Court's grant of summary judgment *de novo*.[115]

B.

"An insured has a cause of action for bad faith against an insurer 'when the insurer refuses to honor its obligations under the policy and clearly lacks reasonable

---

[114] Answering Br. at 74.
[115] *Chemtura*, 160 A.3d at 464.

justification for doing so.'"[116]  When judging reasonableness in this context, "[t]he ultimate question is whether at the time the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability."[117]

Finding that "the Insurers advanced a number of well-reasoned arguments for denying the coverage to Insureds—e.g., the Fraud Exclusion and failure to comply with the Written Consent Provision and/or the Cooperation Clause,"[118] the Superior Court determined that the Insurers did not deny coverage and pursue declaratory relief in bad faith.  The court found further that, given the complexity of the choice-of-law question, applying California law "as a default, while incorrect, was reasonable."[119]

## C.

The Insureds do not argue that the determination of the reasonableness of the legal bases of the Insurers' coverage denial is not within the trial court's province. Instead, the Insureds' principal argument is that the court "should have considered what RSUI did and considered at the time [of the denial] in assessing RSUI's good

---

[116] *Bennett v. USAA Cas. Ins. Co.*, 158 A.3d 877, 2017 WL 961806, at *4 (Del. 2017) (TABLE) (quoting *Enrique v. State Farm Mut. Auto. Ins. Co.*, 142 A.3d 506, 511 (Del. 2001).
[117] *Casson v. Nationwide Ins. Co.*, 455 A.2d 361, 369 (Del. Super. Ct. 1982).
[118] *Arch Ins. Co. v. Murdock*, 2019 WL 1932536, at *6 (Del. Super. Ct. May 1, 2019).  The Written Consent Provision and the Cooperation Clause are not at issue in this appeal.
[119] *Id.*

44

faith."[120]  Emblematic of this complaint is the Insureds' critique of how RSUI's claims adjuster approached the choice-of-law question at the outset. The Insureds acknowledge that the adjuster based his opinion that California law, including Section 533's bar, applied to the Policy on his knowledge that Dole was headquartered in California and that the individuals insured resided in California. But the Insureds argue that the adjuster's failure to balance Delaware's interests against those facts and to review the provision that the Insureds have argued—unsuccessfully—was the Policy's choice-of-law provision precludes a determination by the court that there was a reasonable basis for coverage.

The Insureds' approach, in our view, ignores the test for reasonableness as articulated in *Casson*.[121] The question is whether the insurer is aware of facts and circumstances, at the time of denial, that support a bona fide dispute as to whether the loss is covered. Here, RSUI was aware of the Insureds' and the Policy's contacts with California, and as the closeness of this case on the choice-of-law question demonstrates, those contacts formed the basis of a bona fide dispute. In a similar vein, RSUI was aware of the Court of Chancery's findings that Murdock had committed fraud and that the Policy contained a Profit/Fraud Exclusion. And while we are not ultimately required to decide whether the exclusion applies to the

---

[120] Answering Br. at 69.
[121] *Casson*, 455 A.2d at 369.

45

Stockholder Action settlement, it would be unfair to characterize RSUI's position on that issue as lacking color.

In sum, the Superior Court did not err in granting summary judgment in favor of RSUI on the Insureds' implied-covenant-of-good-faith-and-fair-dealing claim.

## VII.

We affirm the Superior Court's final judgment.